[Cite as *State v. Carver*, 2020-Ohio-4984.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
HIGHLAND COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | |
| Plaintiff-Appellee, | : | Case No. 19CA17 |
| | : | |
| vs. | : | |
| | : | |
| JAMES E. CARVER, | : | <u>DECISION AND JUDGMENT</u> |
| | : | <u>ENTRY</u> |
| Defendant-Appellant. | : | |

_____

<u>APPEARANCES:</u>

Bryan Scott Hicks, Lebanon, Ohio, for Appellant.

Anneka P. Collins, Highland County Prosecutor, Hillsboro, Ohio, for Appellee.

_____

Smith, P.J.:

{¶1} James E. Carver appeals the judgment entry of the Highland County Common Pleas Court, dated August 9, 2019. After a jury trial, Carver was convicted of several counts, including the murder and rape of Heather Camp. On appeal, Carver challenges the sufficiency of the evidence of his convictions. He also asserts that the trial court erred by allowing his interview with a detective to be played in its entirety, in violation of the *corpus delicti* rule. However, upon review of the record, we find no merit to

Carver's arguments.  Accordingly, we overrule both assignments of error

and affirm the judgment of the trial court.

### FACTUAL AND PROCEDURAL BACKGROUND

{¶2} On April 2, 2019, James E. Carver, "Appellant," was indicted as

follows:

| Count 1: | Murder, R.C. 2903.02(A), an unclassified felony; |
| Count 2: | Specification that Offender Displayed, Brandished, Indicated Possession of, or Used a Firearm, R.C. 2941.145;[1] |
| Count 3: | Rape, R.C. 2907.02, a felony of the first degree; |
| Count 4: | Having Weapons while Under Disability, R.C. 2923.13(A)(2), a felony of the third degree; |
| Count 5: | Domestic Violence, R.C. 2919.25 (A), a felony of the third degree; and, |
| Count 6: | Tampering with Evidence, R.C. 2921.12(A)(1), a felony of the third degree. |

{¶3} The indictment arose from activities and conduct which occurred

in Highland County on or about Sunday, February 17 through Tuesday,

February 19, 2019.  Appellant and Heather Camp, the victim, had an

intermittent romantic relationship.  On the evening of Sunday, February 17,

2019, they were traveling together in a black Chevy Trailblazer when

---

[1] The trial court later ordered the counts be renumbered for purposes of trial.  Count 2 was submitted to the jury as a specification finding under Count 1, rather than as an independent count.

Heather was shot in the chest at close range. The evidence demonstrates that Heather was bleeding internally immediately and supports the conclusion that her last 48 hours of life were lived in agony.

{¶4} During an interview with Detective Vincent Antinore of the Highland County Sheriff's Office, Appellant told the detective that after the shooting, Heather and he went back to his camper and had sex. According to Appellant, Heather only complained of her back hurting slightly. According to Appellant, Heather did not want to go to the hospital for treatment because she had outstanding warrants.

{¶5} Appellant also advised the detective that on the next evening, Monday, February 18th, he became concerned about Heather's condition so he took her to the home of his friends, Bobby and Kalie Kinnison. The Kinnisons lived in Greenfield. Appellant said that he and Heather slept at the Kinnisons' that evening and did not engage in sex. However, about 3:00 a.m. on Tuesday, February 19, 2019, Heather indicated she had to use the bathroom. When Appellant attempted to assist her to the bathroom, she urinated on herself.

{¶6} The record demonstrates that around 5:00 a.m. on the 19th, Bobby Kinnison took Heather to the Greenfield Adena Medical Center emergency room (ER). Kinnison told hospital personnel that he found

Heather in the street. Immediate attempts to resuscitate Heather were unsuccessful.

{¶7} Later that week, Appellant was located at an apartment in Dayton, Ohio and taken into custody. As indicated above, Appellant gave an interview. During the interview, Appellant related to the detective several versions describing the circumstances of Heather's shooting and the circumstances which transpired the following two days. Appellant advised that the weapon used was a .22 Ruger pistol and eventually advised where the weapon could be located. Appellant consistently maintained that Heather's shooting was not purposeful but occurred as the result of a struggle with the gun.

{¶8} Appellant proceeded to a jury trial in August 2019. The State of Ohio called various lay and expert witnesses, including medical and law enforcement witnesses. The State also called Ray Dunihue, who supplied the gun to Appellant, and the Kinnisons. The testimony presented at trial is summarized as follows.

{¶9} Dr. Jill Eippert, emergency physician at Greenfield Adena Medical Center, testified Heather Camp was brought to the ER at 5:15 a.m. on February 19, 2019. Dr. Eippert first encountered Heather in the

resuscitation room where a Lucas device[2] had been applied to Heather's chest.  At this point, Dr. Eippert was not aware Heather had been shot.  Resuscitation was not successful so Heather was intubated.  During intubation, Dr. Eippert noticed Heather's jaw was stiff.  On cross-examination she testified that rigor mortis had set in.

{¶10} When Dr. Eippert intubated Heather is when she first noticed Heather's head and facial injuries.  Dr. Eippert described "deep dark bruises around both eyes."  Her eyelids were "swollen shut."  Dr. Eippert told the registrar to call the police because it looked like physical harm was potentially the reason for the death.  Dr. Eippert was also concerned about internal injuries, so she ordered an ultrasound to look at Heather's abdomen and heart.  The test revealed blood in the abdomen.

{¶11} Dr. James McKown, Highland County coroner's investigator, arrived at the ER at 6:45 a.m.  After speaking with Dr. Eippert, Dr. McKown viewed Heather Camp lying on a gurney and immediately noticed extensive physical damage to Heather's face and upper torso, indicative of a suspicious death.  Dr. McKown took various photographs of Heather's injuries and tattoos.  He was the first person to identify Heather's gunshot wound.  Dr. McKown specifically testified Heather Camp had extensive

---

[2] According to https://www.lucas-cpr.com/whylucas,  this device provides safer chest compressions and there is no need to switch CPR providers every two minutes.

bruising around the eyes on both sides; an extensive bruise on the forehead; a bruise on the chin and right side of the head; and bruises of differing ages on the upper arms and torso. Dr. McKown determined Heather would need to be sent to the Montgomery County Medical Examiner for an autopsy. Heather Camp was a "Jane Doe" at this point.

{¶12} Montgomery County assistant deputy coroner, Dr. Bryan Casto, testified that Heather Camp's head, hair, and face were beaten and bloody. He performed the autopsy and prepared a report on February 19, 2019. Dr. Casto identified photographs of Heather's external injuries. Based upon a reasonable degree of medical certainty, Dr. Casto opined Heather's cause of death was a gunshot wound to the torso. She was shot at close range, an inch or less away. Dr. Casto's testimony will be discussed further below.

{¶13} Dr. Jeff Beery, Highland County Coroner, testified he prepared the death certificate and determined the manner of death was homicide. Dr. Beery opined that Heather's face showed evidence of a severe beating. Dr. Beery opined death occurred at 3:00 a.m. on the 19th with a range of three hours either way. He also testified it was common for a person's bladder to release at the moment they pass. To a reasonable degree of medical certainty, Dr. Beery opined Heather's cause of death was a near-range gunshot wound to the torso.

{¶14} Robert Buzzard, an FBI agent, testified that on February 21, 2019 at 6:45 p.m., he and other FBI task force members located Appellant at a residence on East Third Street in Dayton.  He was taken into custody.

{¶15} Mary Camp, Heather's mother, testified she had daily contact with Heather.  Heather and Appellant lived together at times.  Prior to Heather's death, Mary was trying to get Heather to turn herself in because she had outstanding warrants.[3]

{¶16} On February 18th, Mary became concerned about Heather's whereabouts because she had not heard from Heather.  Mary texted Appellant to attempt to get in touch with Heather.  On Monday, February 18th, Appellant assured Mary through text that Heather was fine.  Mary's text conversations with Heather and with Appellant were admitted as exhibits.

{¶17} Tyler Lawrence testified that on Sunday, February 17th, 2019, Heather and he went to Wal-Mart in Hillsboro and then to Wilmington. While they were on their way to Wilmington, they saw Appellant in a Trailblazer following them.  They drove faster to avoid him.  However, later, around 4:00 p.m. or 5:00 p.m., Lawrence drove Heather to meet Appellant

---

[3] According to the Clinton County, Ohio Clerk of Courts online records, Heather had failed to appear in Clinton County on December 14, 2018, for hearings in several open criminal cases.

for dinner at El Dorado in Wilmington.  On February 19, 2019, Lawrence

took officers to Appellant's camper.

{¶18} Roy Dunihue testified that Appellant texted him on Sunday,

February 17, 2019, and asked to borrow a gun.  Dunihue provided Appellant

with a .22 pistol he had previously obtained from a friend in Fayette County.

At about dark Appellant arrived in front of Dunihue's house.  Dunihue took

the gun out to Appellant's vehicle.  The gun was in a holster, loaded, with

the safety on when he gave it to Appellant.  Heather Camp was sitting in the

front seat with Appellant.  Dunihue identified State's Exhibit 1, a Ruger .22

Mark 1, as the gun he gave Appellant.

{¶19} Dunihue further testified that Appellant texted a couple of days

later and indicated he had placed the gun in Dunihue's truck.  Dunihue then

took the gun to his friend's house and put it in a barn.  The gun was not

returned with the holster.  Dunihue assisted Highland County Sheriff's

officers with retrieving the gun on February 22, 2019.

{¶20} Bobby and Kalie Kinnison lived in Greenfield with their

children.  They recalled many of the same facts in their testimony.  On

Sunday, February 17, 2019, they had both been "up" for days, having used

drugs.  Appellant stopped by their home on the 17th for the purpose of drug

trafficking.  Bobby Kinnison testified that Appellant messaged him on the 18th and said somebody had been shot and to open the garage.

{¶21} Upon their arrival around 8:00 or 8:30 p.m., Heather Camp was with Appellant.  She was swollen and bruised and looked like she had been beaten.  Appellant told them another man shot Heather, trying to shoot Appellant.  Appellant and Bobby carried Heather upstairs from the garage to the living room and placed her on a futon.  Upon observing Heather's conditions, both Kalie and Bobby told Appellant repeatedly that she needed to go to the hospital.  Appellant told them Heather had outstanding warrants and didn't want to go to jail.  Appellant acted "indifferent, agitated."

{¶22} Kalie observed Heather's injuries:  "Her face had been badly bruised; her eyes were swollen shut; she had swelling around her rib-cage and very labored breathing."  Heather showed Kalie a bullet wound in the center of her chest.  She repeatedly said her left shoulder hurt and was having a lot of pain in her left side.  Kalie helped Heather into a sitting position and examined her back.  There was no exit wound.

{¶23} Kalie testified Heather was "still slightly lucid, uh, she could still move around a little bit, uh, she could move her arms; but other than that, she needed…at that point she needed help."  Kalie testified as she was assisting Heather, Appellant was standing over Kalie's shoulder.

{¶24} The Kinnisons both testified that Kalie contacted her own mother, Mandy Knisley, to look at Heather. They recalled that Appellant and Bobby helped Heather downstairs to the garage for the purpose of taking her to the hospital. However, moments later, they brought Heather upstairs again. Kalie moved the futon from the living room to a bedroom. Bobby and Appellant carried Heather to the bedroom.

{¶25} Bobby testified that while in the garage he overheard a conversation between Appellant and Heather. She wanted to go to the hospital. Appellant said: "Straighten up, bitch," and he slapped her face. At this point Bobby suggested bringing Heather back upstairs because he wasn't sure what was going to happen to her.

{¶26} Appellant and Heather stayed in one bedroom together. Kalie locked herself and her children in another bedroom. Bobby Kinnison sat up all night in the living room. Around 5:00 a.m. Bobby took Heather to the hospital and told them he found Heather down the street. He did not tell them she had been shot. He did not know Heather was already dead, but when he carried her, he noticed she felt limp.

{¶27} The next morning, Kalie drove Appellant's Trailblazer to take her daughter to school. Kalie found a .22 shell casing on the passenger side floor-board. The Kinnisons testified they put the shell casing in a cell phone

box with other bullets in a kitchen cabinet. Appellant left around 9:00 or 10:00 a.m. He returned later in the day with a girl, C.G. Appellant seemed nervous and "on edge." C.G. told Bobby to put seat covers on the trailblazer.

{¶28} Both Kinnisons acknowledged they were not initially truthful with law enforcement officers because of their fear of Appellant. Kalie was terrified something would happen to her family. She described Appellant as "menacing" and testified Appellant had ties with people he called "The Brotherhood." Bobby testified he was scared of getting into trouble and scared of Appellant. Since that time, both have completed drug rehabilitation and Bobby is employed.

{¶29} On cross-examination, Kalie admitted that Heather did say twice that she didn't want to go to the hospital because she had warrants and would go to jail. On cross-examination, Bobby admitted he was getting drugs from Appellant and re-selling them out of his home. He admitted that when he first talked to the police he didn't tell them Appellant slapped Heather.

{¶30} Mandy Jo Knisley, Kalie's mother, acknowledged her felony record and testified she was currently undergoing drug rehabilitation. When Mandy arrived at the Kinnisons' home, Heather was lying on a futon.

Mandy described Heather: "She was just very beaten. She was just really tiny. Her eyes were swollen; her lips were black; and she was laying there by herself." Mandy took Heather's hand. Heather was spitting blood clots out of her mouth. Appellant explained that someone shot a bullet that grazed Heather. Mandy examined Heather, saw the bullet hole, and said "This doesn't look like a graze."

{¶31} Mandy testified she tried to comfort Heather. Heather's eyes were shut. Appellant was pacing. Mandy asked Heather if she wanted help, if she wanted to go to the hospital. Heather indicated "that she did; that she didn't want to die." Appellant then said: "No. She's not going to the hospital." Appellant told Mandy this was because Heather had a warrant, "he loved her, and he didn't want her to go to the hospital." Mandy testified she told Appellant several times that he needed to take Heather to the hospital. As she left, Appellant was putting Heather in the passenger seat of the car.

{¶32} Haydee Lara, a forensic DNA analysist with the Ohio Bureau of Criminal Investigation (BCI) prepared a DNA report, Exhibit 16. Ms. Lara's opinions were given within a reasonable degree of medical certainty. Lara testified she tested nipple swabs taken from Heather Camp's breasts. She also tested oral swabs taken from Appellant. The nipple swabs

contained a DNA mixture consistent with Heather Camp and Appellant.  She testified that Exhibit 21, a pair of boots with blood stains, also contained a DNA mixture of Heather and Appellant inside the left boot.

{¶33} Andrew McClelland, a forensic firearm examiner with BCI, identified State's Exhibit 1 and State's Exhibit 24.  Exhibit 1 was a Ruger model .22 caliber long rifle semiautomatic pistol.  Exhibit 24 was McClelland's report on a test of the gun.  McClelland testified to a reasonable degree of scientific certainty that the firearm was in good working order.

{¶34} McClelland testified about the gun's safety mechanism.  He explained that if placed into the safe position the firearm will not fire when the trigger is pulled.  In order to fire the safety must be disengaged. McClelland testified a person would have to first take the safety off and then pull the trigger to make it fire.

{¶35} Lieutenant Brian McNeil of the Greenfield Police Department searched the Kinnisons' residence in Greenfield.  He testified the residence was approximately one city block from the Greenfield ER. Lieutenant McNeil identified photographs taken at the Kinnison residence:  a futon where Heather Camp was placed; a box inside a kitchen cupboard containing .22 caliber cartridges; the box itself; the cartridges; a spent shell casing

removed from the box.  He also identified photographs of a trash bag on the front porch and black boots recovered from the trash bag at the Kinnisons' residence.  He placed the items into evidence.  Lieutenant McNeil also assisted in executing a search warrant of Appellant's black Chevy Trailblazer.

{¶36} Detective Randy Sanders of the Highland County Sheriff's Office located Mary Camp and advised her of Heather's death.  He also interviewed Heather's sister, Brandy Camp, and Tyler Lawrence.  Lawrence then took them to Appellant's camper in Highland County and to the Kinnisons' residence in Greenfield.  The Kinnisons were initially interviewed separately.  Detective Sanders testified that after Bobby understood the gravity of the situation, he "broke down" and started crying and asked to go inside where Kalie was and "get the story straight."

{¶37} Detective Sanders assisted Detective Antinore in preparing a search warrant for the camper and assisted in serving the warrant and searching the camper.  He identified photographs of the camper and items found inside it.  The officers found male and female clothing.  The camper's wall had "James and Heather" written on it.  Officers found three bags of clothing, one containing a pink bra with blood on it and a gray shirt with a hole and with blood on it.  In the bag which contained the bra and shirt,

officers also found three identification cards, one an Ohio Women and Children's Program (WIC) card, issued to Heather Camp. Photographs of the bed showed blood stains on the sheets.

{¶38} On February 21st, officers contacted BCI for assistance in locating Appellant. Eventually, a license plate reader hit on Appellant's vehicle at East Third Street in Dayton.[4] Detective Sanders contacted Agent Buzzard. Buzzard located the Trailblazer in a parking lot on East Third Street. Appellant was taken into custody.

{¶39} Detective Sanders assisted in searching the East Third Street apartment and discovered trash bags. One of the trash bags contained boots. The officers also located a pair of pants with blood stains on them which came out of a purple Adidas bag.[5] They also found Appellant's wallet.

{¶40} Detective Sanders and other officers went to Roy Dunihue's residence in Highland County. Dunihue ultimately took them to a barn in Fayette County where a .22 Ruger semiautomatic pistol in a plastic bag was retrieved from a dryer. Detective Sanders identified photographs of the ammunition and State's Exhibit 1, the Ruger .22 pistol.

---

[4] A license plate reader attached to a police cruiser logs license plates as the cruiser passes them, recording the time and location the plate was read.

[5] In his interview with Detective Antinore, Appellant explained he had put items in the trash bags to "downsize." He also acknowledged ownership of the Adidas bag.

{¶41} Detective Vincent Antinore attended the autopsy. He testified it was difficult to identify Heather Camp at first because of the "bruising and apparent beating she had taken." He assisted in locating Heather's family and interviewed Tyler Lawrence, who identified Bobby Kinnison and directed them to Appellant's camper. Detective Antinore also assisted with execution of the search warrant on the camper on February 20th. Over the next 2 days, he and Detective Sanders focused on apprehending Appellant.

{¶42} Detective Antinore testified about his interview with Appellant. Detective Antinore testified he had received specialized training in interviewing suspects. He had been trained to befriend a suspect; "get on the same level" as the suspect; suggest an "alternate" explanation for the circumstances of the crime; and establish a bond with the suspect. Detective Antinore identified State's Exhibit 122, a disk copy of the actual interview which he conducted with Appellant.

{¶43} At this point, defense counsel objected, based upon the corpus delicti rule, to playing any parts of the interview where Appellant referenced having sex with Heather Camp. After some discussion, the trial recessed for lunch. After returning from lunch, the court stated:

> Counsel, I want to go back and revisit the issue of the tape.
> ***Because I'm concerned about the corpus delicti rule here.
> ***The objection was that there has not been independent
> evidence of the crime of rape established; therefore, the corpus

delecti rule would prevent the admission of the statements of the defendant that he engaged in sexual conduct with the victim. Does that accurately state your objection, right?

{¶44} Defense counsel agreed. After further lengthy discussion, the trial court overruled the objection. The interview between Detective Antinore and Appellant was played for the jury.

{¶45} At the conclusion, Detective Antinore testified that he was able to confirm that Appellant and Heather went to Frisch's and Burger King on Monday, February 18th. Surveillance video from Frisch's demonstrated Appellant was driving the black Trailblazer. He also testified that in driving from Frisch's to Burger King, one would drive past the Highland District Hospital emergency room.

{¶46} Detective Antinore also testified he assisted with the search warrant executed on the Trailblazer on February 24th. He identified photographs of the vehicle as it appeared on February 24th. He also obtained a search warrant for Appellant's phone in order to view text messages and Facebook messages. He identified photographs of text conversations of Appellant. In one exhibit, Appellant asked an unidentified person to stop by his camper and remove Heather's belongings.

{¶47} Detective Antinore thereafter testified to Appellant's criminal history of domestic violence convictions. He also testified he swabbed

Appellant's mouth for DNA. He identified the blue jeans that Appellant was wearing when Heather was shot. Appellant testified that the jeans were removed from the Adidas bag. He also identified the pink bra and gray shirt with blood stains. On cross-examination, Detective Antinore acknowledged that in the interview, Appellant never explicitly stated "I pulled the trigger and I meant to shoot her."

{¶48} After Detective Antinore's testimony concluded, the State offered its exhibits and rested. Defense counsel made a Crim.R. 29 motion for acquittal. Specifically, defense counsel argued as to the murder charge, that the State had presented no evidence that Appellant purposely caused Heather Camp's death. As to the rape charge, counsel argued that the State had to prove that Appellant knew or should have known that Heather Camp was unable to consent or to physically resist. He argued that no evidence had been produced as to that element. The trial court overruled the motion.

{¶49} The jury returned guilty verdicts on murder, rape, assault, and tampering.[6] Appellant was sentenced to a total of 33 years to life in prison. This timely appeal followed. Where pertinent, we set forth additional facts below.

---

[6] The jury did not convict Appellant of domestic violence. Instead, he was convicted of the lesser included offense of assault.

ASSIGNMENTS OF ERROR

"I. THE COURT ERRED IN ALLOWING THE INTERVIEW
TO BE PLAYED WITHOUT REDACTING THE
DISCUSSION ON SEX.

II.  THE STATE FAILED TO PROVE BEYOND A
REASONABLE DOUBT THAT IT WAS MURDER
INSTEAD OF RECKLESS HOMICIDE OR THAT IT WAS
RAPE."

ASSIGNMENT OF ERROR ONE - CORPUS DELICTI RULE

{¶50} Under the first assignment of error Appellant asserts the

trial court erred in allowing the State to play for the jury the portion of

Appellant's interview in which he discusses alleged consensual sex with

Heather Camp prior to her death.  Appellant made a timely objection on this

ground at trial.  Appellant's argument raises the issue of the proper

application of the corpus delicti rule in this case.

STANDARD OF REVIEW

{¶51} We review a trial court's decision as to whether the State

established the corpus delicti of a crime under a manifest weight of the

evidence standard.  *See State v. Whiting,* 4th Dist. Ross, No. 18CA3672,

2019-Ohio-5471, at ¶ 36.  *See In re W.B.* II, 4th Dist. No. 08CA18-2009-

Ohio 1707, ¶ 31 and 32.  Thus, we will uphold the trial court's decision as

long as the record contains some competent and credible evidence

independent of the defendant's confession to establish that a crime occurred.

*See e.g.*, *State v. Maranda,* 94 Ohio St. 364, 114 N.E. 1038, paragraphs one and two of the syllabus (1916); W.B. at ¶ 32.

LEGAL ANALYSIS

1. <u>Corpus Delicti Rule.</u>

{¶52} " 'The corpus delicti of a crime is essentially the fact of the crime itself.' " *Whiting, supra,* quoting *State v. Young,* 4th Dist. Washington No. 12CA14, 2013-Ohio-3418, at ¶ 27, quoting *State v. Hofer,* 4th Dist. Adams No. 07CA835, 2008-Ohio-242, ¶ 36; *see also State v. Haynes,* 130 Ohio App.3d 31, 34, 719 N.E.2d 576 (1998).  The corpus delicti of a crime "is comprised of '(1) the act [and] (2) the criminal agency of the act.' " *Young, supra,* quoting *State v. Maranda, supra*, at paragraph one of the syllabus; *see also State v. Edwards*, 49 Ohio St.2d 31, 34, 358 N.E.2d 1051 (1976), vacated on other grounds, 438 U.S. 911, 98 S.Ct. 3147 (1978); *State v. Van Hook,* 39 Ohio St.3d 256, 261, 530 N.E.2d 883 (1988).  *See also In re W.B., II, supra*, at ¶ 33-34; *State v. Puckett,* 2010-Ohio-6597, 947 N.E.2d 730, ¶ 16 (4th Dist.).

{¶53} The Supreme Court of Ohio noted in *Maranda,* "[i]t has long been established as a general rule in Ohio that there must be some evidence outside of a confession, tending to establish the corpus delicti, before such confession is admissible." *Maranda* at paragraph two of the syllabus; *see*

*also Young* at ¶ 27.  Thus, a court may not admit an extrajudicial confession

unless the State has produced independent evidence of the corpus delicti of a

crime.  *Maranda* at paragraph two of the syllabus; *Hofer* at ¶ 36; Y*oung* at ¶

27.

> {¶54} Our own court, in *Whiting,* observed:

> The quantum or weight of such outside or extraneous evidence
> is not of itself to be equal to proof beyond a reasonable doubt,
> nor even enough to make it a prima facie case.  It is sufficient if
> there is *some evidence outside of the confession that tends to*
> *prove some material element* of the crime charged. (Emphasis
> added).

*Id*. at ¶ 39, quoting *Maranda* at paragraph two of the syllabus; *see also* St*ate*

*v. Edwards, supra,* at ¶ 34; *State v. Young, supra*, at ¶ 27.  Further, the

outside or extraneous evidence may be direct or circumstantial.  *Whiting* at

¶ 40; *Young* at ¶ 27, citing *Maranda* at 371; *see also State v. Nicely,* 39 Ohio

St.3d 147, 154-155, 529 N.E.2d 1236 (1988) and *State v. Clark*, 106 Ohio

App.3d 426, 431, 666 N.E.2d 308 (1995).

{¶55} In this case, the State was allowed by the trial court to play an

unredacted version of Appellant's interview with Detective Antinore for the

jury.  In that interview, Appellant states several times that he had sex with

Heather Camp at his camper after she was shot.  The trial court allowed the

entire interview to be played on the basis that the State had some evidence

on one of the elements of rape.  The State had argued that the coroner's

testimony showed that Heather would have been in pain. The State

persuaded the trial court that the coroner's testimony was enough to meet the

element of "inability to consent due to substantial impairment. "

{¶56} Appellant argues this is simply not enough to rise to a level of

substantial impairment. Appellant points out women often have consensual

sex while in pain or not physically well. Appellant further points out the

evidence that: (1) Heather Camp was shot sometime Sunday evening and

the consensual sex occurred that same evening; (2) both Appellant and

Heather appeared at Frisch's the following evening; (3) Heather was still

capable of communicating and walking when she arrived at the Kinnisons'

on Monday evening. Appellant emphasizes that although the standard of

"some evidence * * * that tends to prove a material element of the crime

charged" is lower than reasonable doubt, the evidence provided must be

more than "anything goes." For the reasons which follow, we disagree with

Appellant.

{¶57} As set forth above in *Maranda* and most recently in *Whiting,*

the corpus delicti rule is clear that "some evidence [direct or circumstantial]"

is sufficient. In this case, Appellant was convicted of rape, pursuant to R.C.

2907.02(A)(1)(c) which provides:

> (A)(1) No person shall engage in sexual conduct with another
> who is not the spouse of the offender or who is the spouse of

the offender but is living separate and apart from the offender, when any of the following applies:
* * *
(c) The other person's ability to resist or consent is substantially impaired because of a mental or physical condition * * * and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition * * *.

{¶58} In response to the defense objection, the prosecutor focused on the "substantial impairment" element as set forth above. The prosecutor argued:

So my question then: A material element of rape. But, it doesn't have to be only a material element of the sexual assault part of it; there are other elements to that crime. * * * [Her physical condition is such that…and we have that testimony. * * * That she was in bad shape that night; that she would have been bleeding out immediately; that she would have been in serious pain; that Gabapentin wouldn't even have dulled the pain, wouldn't have done anything for her. We have that testimony. So, we have that element.

{¶59} Defense counsel disagreed, indicating that the testimony regarding Heather Camp's weakened state and impairment was in reference to the following day. Defense counsel also pointed out there was no evidence of cognitive impairment. The prosecutor directed the court and counsel to the *Puckett* and *Maranda* cases. After consideration, the trial court overruled the objection.

{¶60} We believe the trial court properly analyzed the testimony and

the corpus delicti rule in this case. Haydee Lara, the forensic expert, testified that she tested the oral swabs taken from Appellant. She also examined the nipple swabs taken from Heather Camp's body and determined the DNA mixture from the nipple swabs to be consistent with both Heather and Appellant. We agree with the trial court's conclusion that there was evidence of sexual contact and possible sexual conduct. We also agree with the trial court's conclusion that Dr. Casto, the deputy coroner who provided expert testimony, provided some evidence that Appellant knew or had reasonable cause to believe that Heather Camp's ability to resist or consent was substantially impaired because of her physical condition.

{¶61} Dr. Casto identified State's Exhibit 6, the autopsy report of Heather Camp. He also identified various photographs of Heather's body which demonstrated her external injuries: blackened "raccoon eyes"; a forehead abrasion; a contusion on her nasal bridge; extensive bruising on her scalp; a large bruise on the right breast area; scattered bruising of varying colors on her extremities; a bruise on her buttock. Dr. Casto testified when he removed the medical equipment on Heather's chest, he discovered the gunshot wound.

{¶62} Dr. Casto's autopsy report also documented Heather's internal injuries. He testified the bullet grazed her aorta and went through her liver,

esophagus and diaphragm, lodging in her spine. Dr. Casto found blood in the chest cavity and her belly, testifying that she had over 2 liters of internal blood loss. Dr. Casto testified, given her size, she had lost a lethal amount of blood, almost half of her blood, internally. The immediate cause of death was the blood loss. Based on a reasonable degree of medical certainty, Dr. Casto opined that she was shot at close range.

{¶63} Dr. Casto opined that Heather was shot with a small caliber weapon and the bullet just grazed her aorta and lodged in her spine instead of having an entrance and exit. This explained why she lived a few days instead of just a few minutes. Dr. Casto described Heather's physical condition after suffering the injury, qualifying that he could not be specific:

> Would she have pain with this injury? Certainly. Okay, uh, very early on in the process. Uh, eventually as the bleeding becomes more brisk and more life threatening, she'll have other symptoms, now when that happened, I do not know, right? Uh, but you would expect a loss or drop in your blood pressure; your color may change; you may feel cold; you may feel dizzy, nauseous; you know, lots of things are going to decline as the blood loss into the chest and abdomen becomes worse and worse.

{¶64} On cross examination, Dr. Casto testified:

> [K]eep in mind, everything else is bleeding, the liver, the esophagus, the diaphragm, all those are bleeding from point

zero.    I mean they began bleeding immediately, there was a wind path through them…[7]

{¶65} He also testified regarding the toxicology report.  It detected Gabapentin, amphetamine and methamphetamine.  He testified Gabapentin is supposed to dull nerve pain but he did not know if it would dull "this kind of pain" or not.

{¶66} Did Dr. Casto's testimony provide some evidence of substantial impairment because of her physical condition?  Our research has not yielded any cases with similar fact patterns involving persons substantially impaired due to physical injury.  Many cases have discussed the definition of "substantial impairment" in the context of cases involving victims who were mentally disabled or under the influence of intoxicating substances.  At least one of these cases has provided some guidance.

{¶67} *State v. Foster,* 8th Dist. Cuyahoga No. 108340, 2020-Ohio-1379, involved allegations of rape of a substantially impaired victim who went back to Foster's hotel room after a night of drinking with other persons, but not with Foster.  Foster and the alleged victim met in a cab.  Foster acknowledged having consensual sex with the accuser.  He was convicted of "substantial impairment rape," R.C. 2907/02(A)(1)(c).  On

---

[7] On redirect, he clarified that as soon as the bullet struck the liver and the esophagus, it started bleeding heavily from those two spots.

appeal the issue was whether Foster knew or had cause to believe victim was substantially impaired. Foster's conviction was overturned. In its decision the appellate court noted there was no testimony that Foster was aware of the victim's consumption of a large quantity of alcohol, and none of the State's witnesses who interacted with the victim prior to the sexual incident testified that she showed specific signs or indications of substantial impairment such that Foster would have or should have known that her ability to consent to sexual conduct was substantially impaired.

{¶68} The *Foster* court observed that the term "substantially impaired" is not statutorily defined and therefore, the term must be given the meaning " 'generally understood in common usage.' " *Id*. at 42, quoting *State v. Zeh,* 31 Ohio St.3d 99, 103, 509 N.E.2d 414 (1987). The State can show substantial impairment by offering evidence "demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of [her] conduct or to control [her] conduct." *Foster, supra*, quoting, *Zeh,* at 103-104, 509 N.E.2d 414. Moreover, "substantial impairment does not have to be proven by expert medical testimony; rather, it can be shown to exist by the testimony of people who have interacted with the victim." *Foster, supra,* at 45, quoting *State v. Brady,* 8th Dist. Cuyahoga

No. 87854, 2007-Ohio-1453, at ¶ 78; *see also State v. Jones,* 8th Dist.

Cuyahoga No. 101311, 2015-Ohio-1818, ¶ 43.

{¶69} *Foster* further observed:

A person's conduct becomes criminal only when engaging in sexual conduct with an intoxicated victim when that person knows or has reasonable cause to believe that the victim's ability to resist or consent is substantially impaired because of her intoxication. *State v. Noernberg,* 8th Dist. Cuyahoga No. 97126, 2012-Ohio-2062, ¶ 11; *State v. Rivera,* 8th Dist. Cuyahoga No. 97091, 2012-Ohio-2060, ¶ 22; and *State v. Martin,* 12th Dist. Brown No. CA99-09-026, 2000 WL 1145465 (Aug. 12, 2000). "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).

*Foster,* at ¶47.

Whether an offender knew or had reasonable cause to believe the victim was impaired may be reasonably inferred from a combination of the victim's demeanor and others' interactions with the victim. *Jones,* 8th Dist. Cuyahoga No. 101311, 2015-Ohio-1818, at ¶ 43, citing *State v. Novak,* 11th Dist. Lake No. 2003-L-077, 2005-Ohio-563, ¶ 25. Evidence that should have alerted an offender to whether a victim was substantially impaired may include evidence that the victim was stumbling, falling, slurring speech, passing out, or vomiting. *King* at ¶ 20; *State v. Hatten,* 186 Ohio App.3d 286, 2010-Ohio-499, 927 N.E.2d 632, ¶ 50 (2d Dist.).

*Foster,* at 48. *Foster* also referenced *State v. Keller,* 8th Dist. Cuyahoga No.

106196, 2018-Ohio-4107 (where defendant was present during entire

evening when the victim consumed alcohol and smoked marijuana and

drove her to their friend's house knowing she could not drive her vehicle due to her intoxication), and *State v. Freeman,* 8th Dist. Cuyahoga No. 95511, 2011-Ohio-2663 (defendant sent into motion a scenario where a 15-year-old victim ended up in the defendant's van where he supplied potent drugs to her.)

{¶70} Based upon our review of the pertinent law and the facts of this case, we find Dr. Casto's testimony provided some evidence of Heather Camp's substantial impairment based upon her physical condition. Dr. Casto testified she would have been in physical pain "very early on in the process." He testified her liver, esophagus, and diaphragm were "bleeding immediately."

{¶71} In addition, Appellant's interview provides additional evidence of her physical condition after the shooting. In *Foster*, the court noted that evidence of substantial impairment is not required to be from expert witnesses but may be from persons who have interacted with a victim. While in *Foster* the defendant didn't know the alleged victim was drunk and saw no signs of mental or physical impairment, here Appellant did interact with Heather Camp after the shooting. Again, a person has knowledge of circumstances when he is aware that such circumstances probably exist. R.C. 2901.22(B).

{¶72} Appellant knew or had reasonable cause to believe she was physically impaired. In the portions of the interview which were not objected to, Appellant told Detective Antinore that when they went back to the camper, she walked with his assistance and told him her back hurt. According to Appellant, Heather asked him to "try to get her some pain pills." Appellant stated in the interview, "You can tell she's not 100%."

{¶73} The *Foster* court also noted the State can show substantial impairment by offering evidence demonstrating "a present reduction * * * in the victim's ability, either to appraise the nature of [her] conduct or to control [her] conduct." By the time Heather Camp, with a close-range gunshot wound to the chest, reached Appellant's camper in rural Highland County, the evidence suggests a reduction in her ability to control her conduct. With immediate internal bleeding, her need for assistance with walking, back pain, and request for pain medication, it is unlikely that Heather could have controlled her "physical conduct." It is unlikely that she could have escaped Appellant's Trailblazer or escaped his camper and gotten away from him under the circumstances of her substantially impaired physical condition.

{¶74} While the trial court and parties focused on Heather's substantially impaired physical condition, arguably, Appellant knew or had

reasonable cause to believe that Heather's ability to consent was substantially impaired because of her mental condition.  We are mindful that all medical witnesses and experts testified that Heather's face, head, and scalp were badly bruised and beaten, so much so that her eyes were swollen shut.  In fact, the evidence demonstrates that she appeared to be badly beaten about the head when she arrived at the Kinnisons'.  Dr. Casto's testimony noted "early cerebral edema," which according to him meant swelling of the brain. In his interview, Appellant said immediately after Heather was shot, she said "Motherfucker, you shot me."  At that point of the interview, Appellant told Detective Antinore, "She's not fine.  Like in shock."  All this testimony suggests that Heather's mental condition was also impaired.

{¶75} For the foregoing reasons, we find the trial court did not err in its analysis of the corpus delicti rule.  We find there was some evidence that Heather Camp's physical condition was substantially impaired.  This was some evidence of a material element of the crime of rape.  Therefore, the trial court did not err by overruling Appellant's objection to playing portions of the interview with Detective Antinore in which Appellant discussed consensual sex.  As such, we find no merit to Appellant's argument that the trial court erred in allowing the full interview to be played and without

redacting the portions referring to consensual sex.  Accordingly, the first

assignment of error is overruled.

ASSIGNMENT OF ERROR TWO -
SUFFICIENCY OF THE EVIDENCE

STANDARD OF REVIEW

{¶76} " 'A claim of insufficient evidence invokes a due process

concern and raises the question of whether the evidence is legally sufficient

to support the verdict as a matter of law.' "  *Whiting, supra,* at ¶ 36, quoting

*State v. Blanton,* 2018-Ohio-1278, 110 N.E.3d 1, ¶ 12 (4th Dist.), citing

*State v. Wickersham,* 4th Dist. Meigs No. 13CA10, 2015-Ohio-2756, ¶ 22;

*State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).  "When

reviewing the sufficiency of the evidence, our inquiry focuses primarily

upon the adequacy of the evidence; that is, whether the evidence, if believed,

reasonably could support a finding of guilt beyond a reasonable doubt."

*Blanton at* ¶ 12, citing *Thompkins* at syllabus.  "The standard of review is

whether, after viewing the probative evidence and inferences reasonably

drawn therefrom in the light most favorable to the prosecution, any rational

trier of fact could have found all the essential elements of the offense beyond

a reasonable doubt."  *Blanton* at ¶ 12; citing *Jackson v. Virginia,* 443 U.S.

307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Jenks,* 61 Ohio

St.3d 259, 273, 574 N.E.2d 492 (1991).  "Furthermore, a reviewing court is

not to assess 'whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction.' " *Blanton* at ¶ 12, quoting *Thompkins, supra*, at 390.

{¶77} This test raises a question of law and does not allow us to weigh the evidence. *See Whiting,* at ¶ 37; *State v. Martin,* 20 Ohio App.3d 172, 174, 485 N.E.2d 717 (1983). Rather, the test "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson* at 319. We reserve the issues of the weight given to the evidence and the credibility of witnesses for the trier of fact. *See State v. Thomas,* 70 Ohio St.2d 79, 79–80, 434 N.E.2d 1356 (1982); *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus (1986).

LEGAL ANALYSIS

{¶78} For ease of analysis, we begin with Appellant's challenge of his murder conviction. He asserts that the evidence was insufficient to support proof of murder beyond a reasonable doubt and instead supports a conviction for reckless homicide. For the reasons which follow, we disagree.

1. Murder

{¶79} Appellant was convicted of murder, R.C. 2903.02(A), which states: "No person shall purposely cause the death of another * * *." A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature. R.C. 2901.22 (A). Appellant concedes responsibility for causing Heather Camp's death; however, he argues the State had insufficient evidence that Appellant *intended* for her to be shot. Appellant urges us to conclude that the physical evidence, as well as his interview, supports a finding of reckless homicide instead of murder.

{¶80} Appellant admits that it was reckless to get the gun out of the holster; reckless to point the gun at anyone; reckless to either turn the safety off or be in such a position that the safety could come off; and reckless to hold the gun in a way that the trigger could be pulled. However, Appellant argues the evidence shows he was the person who told them where the gun could be recovered. He also argues that the very serious crime of reckless homicide motivated his evasive actions. Additionally, he asserts that taking her out in public and asking for help are not congruent with having intentionally harmed her. In fact, Appellant argues his behavior is consistent

with someone who actually cared about Heather Camp and also realized he was in serious trouble.

{¶81} We are not persuaded. We have reviewed Appellant's video-recorded interview with Detective Antinore which the jury saw at trial. First of all, it is a mischaracterization to indicate that Appellant was completely forthcoming with the circumstances surrounding the gun. While he eventually told officers that he obtained the gun from Roy Dunihue, he first told officers that the gun was stolen from his house and actually in Heather's bag. Then, three times he told officers that the gun was thrown out of the car onto the side of the road after the shooting. Not until the very end does Appellant inform the officers that he returned it to Dunihue's truck.

{¶82} We are likewise not convinced that Appellant taking Heather through the Frisch's drive-thru and later to the Kinnisons' house is indicative of his concern for her. In the interview, Appellant admits that it is dark and Heather didn't eat anything. There's no evidence he asked anyone at Frisch's to help Heather. Additionally, the evidence demonstrated he also drove her to Burger King, bypassing a hospital facility where he could have sought help between the two restaurants.

{¶83} In the interview Appellant relates going back to his camper after the shooting. When he decided they should leave the camper,

Appellant told officers that he pulled his car up to the back of the camper and had Heather come out that way so his neighbors Amy and Todd would not see her. We cannot agree that these actions demonstrated concern for Heather. Rather, these actions tend to demonstrate Appellant's concern for himself and concealing his crime.

{¶84} Further, Appellant's statements to the officers that he insisted Heather go to the hospital but she didn't want to because she had warrants are easily construed as self-serving. These statements are obviously contrary to the testimonies of Mandy Jo Knisley, Bobby Kinnison, and Kalie Kinnison, who each testified that Heather stated at least once that she wanted to live. In particular, it appears that Mandy Jo Knisley was so insistent that Heather be taken for treatment that Appellant concocted the scene in which he and Bobby take Heather downstairs to the garage as if they were taking her to the hospital, but then bring her back upstairs after Mandy leaves. Importantly, Bobby Kinnison also testified that in the garage, Appellant slapped Heather's face, already obviously beaten, and told her to, "Straighten up, bitch." Ostensibly, Appellant was admonishing Heather to "straighten up," and not indicate to anyone again that she wanted to live.

{¶85} As one can see, the evidence in this case demonstrates the volatile nature of Appellant and Heather Camp's relationship. There is

evidence of physical abuse and substance abuse. The evidence also suggests that jealousy was a possible motive for shooting Heather.

{¶86} The evidence indicates that Appellant had dinner plans with Heather Camp on Sunday, February 17, 2019. Roy Dunihue testified that sometime on that date, Appellant texted him and asked to borrow a gun. After drinking with Heather and arguing, Appellant went to Dunihue's place with Heather in the vehicle to pick up the gun. Dunihue testified he gave Appellant the gun in a holster with the safety on. According to one version provided by Appellant, Heather was shot shortly after he received the gun from Dunihue, while they were still sitting in Dunihue's driveway.

{¶87} During Appellant's emotional interview, he mentioned Mike Scholler several times. In the first few moments of the interview, he stated that, "She was driving the Trailblazer. [They] got into it over Mike Scholler. I grabbed the gun and it went off." He also indicates that Mike Scholler is in Hamilton, Ohio. Appellant repeatedly explains they argued over Mike Scholler, but at times indicates Heather grabbed the gun. He even tells Detective Antinore that Heather said she'd "set Mike up for him."

{¶88} Towards the end of the interview, Appellant seems to describe the overall toxic nature of his relationship with Heather. He states: "She's on the run…I'm selling dope. We've got no one to lean on but each other.

We always fuck it up."  Facts tending to suggest Appellant's jealousy with regard to Heather are scattered throughout his interview.

{¶89} Earlier in the interview, Appellant stated there was "only one person I had a problem with her seeing - Tyler."  Appellant stated that when he picked [Heather] up, he "didn't want to hear about the past."  Appellant told Detective Antinore he took her to her sister's house to pick up her "stuff."  While Heather is inside and Appellant is outside waiting for her, her "ex-boyfriend pulls up" and "come in."  "She's inside 20-30 minutes."  Appellant got mad and left.  He texts her and she replies, "Why are you being an asshole?"

{¶90} At the end of the interview, Appellant relates that they were arguing and he told her to "get off him."  He pointed the gun at her and she kicked him.  Appellant stated, "I didn't want to argue with her."  Then he provides information that he has not previously provided in the first part of the interview.  Appellant told Detective Antinore:  "I was mad, I put money up for bail.  I wanted to get a hotel room.  She said she was busy.  Always something stupid between us."

{¶91} While during the interview Appellant maintained that he didn't intend to shoot Heather and that he only pointed the gun to scare her, we believe the jury could reasonably infer that Appellant shot Heather out of

jealousy. The evidence provided in the interview indicates that Heather had ongoing relationships with "Tyler,"[8] an "ex-boyfriend," and Mike Scholler, which caused Appellant to be upset. They argued at dinner and Mike Scholler came up. According to Appellant, Heather told him she saw Mike Scholler at Wal-Mart earlier. Appellant may not have actually planned for days or weeks to shoot Heather Camp, but he did make arrangements to obtain a gun on a day he argued with her. Appellant pointed a gun at her with the safety off – a gun that was given to him holstered with the safety on, according to Dunihue's testimony. A jury could certainly reasonably infer that Appellant purposely pulled the trigger with the intention of killing her.

{¶92} Our conclusion that Appellant's actions were purposeful is bolstered by evidence of jail phone calls made while Appellant awaited trial. Detective Antinore testified Appellant made approximately 7000 calls from the Highland County jail. Detective Antinore regularly reviews the phone calls made from the jail. He reviewed a call log which demonstrated that on March 30, 2019, Appellant made a phone call during which he told the other speaker that he "knew the safety was off the gun."

---

[8] We do not know whether or not Tyler refers to Heather's friend Tyler Lawrence, who drove them around earlier in the day. Tyler Lawrence testified that Appellant followed them earlier in the day between Wilmington and Highland County.

{¶93} Additionally, Roy Dunihue testified he handed Appellant the gun in a holster with the safety on. Andrew McClelland, the BCI expert who tested the gun testified that in order to fire the firearm, the safety must be disengaged. In his interview with Detective Antinore, Appellant explained at least twice that the shooting occurred as soon as he brought the gun into the vehicle. We think it may then be reasonably inferred that Appellant purposely removed the gun from the holster and removed the safety mechanism with the intention of firing the gun.

{¶94} Detective Antinore's testimony regarding jail phone calls also belies Appellant's self-serving statements in his interview and on appeal that he was trying to help her. In a June 6, 2019 jail phone call, Appellant discussed Heather's outstanding warrants. Detective Antinore testified: "James tells the other individual that he's talking to, that when he met with Heather Camp at El Dorado's Restaurant in Wilmington, her intention was to turn herself in on the warrants that she had." This directly undermines Appellant's interview statements in which he stated that it was Heather who did not want to seek medical treatment for fear of being taken to jail.

{¶95} Detective Antinore further testified, "[Appellant] observed a plastic bag with loose leaf tobacco that she intended to take into the jail with her when she turned herself in." Detective Antinore further identified a

State's exhibit tote bag taken from Appellant's camper with the bloody bra and shirt.  Inside the tote bag was also a clear plastic bag containing loose leaf tobacco, as described in the phone call.

{¶96} " 'When a court reviews the record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." ' " *State v. Bennington,* 4th Dist. Adams No. 18CA1078, 2019-Ohio-4386, at ¶ 11, quoting *State v. Maxwell,* 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 146, quoting *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; following *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).  "The court must defer to the trier of fact on questions of credibility and the weight assigned to the evidence."  *State v. Dillard*, 4th Dist. Meigs No. 13CA9, 2014-Ohio-4974, 2014 WL 5800342, ¶ 22, citing *State v. Kirkland,* 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 132; *State v. Lodwick,* 2018-Ohio-3710, 118 N.E.3d 948, ¶ 9 (4th Dist.).  In this case, the trial court gave standard Ohio jury instructions on reasonable doubt, credibility of witnesses, direct evidence, circumstantial evidence, and inferences to be made.  Specifically, the trial court instructed:

To infer, or to make an inference, is to reach a reasonable conclusion, or deduction of facts, which you may, but are not required to make, from other facts which you have found to have been established by direct evidence. Whether an inference is made rests entirely with you.

{¶97} In this case, we defer to the jury who heard the testimony of the witnesses and also viewed Appellant's video interview. We find there was sufficient evidence from which a rational person could find evidence of Appellant's intent to shoot Heather Camp beyond a reasonable doubt. Thus, we find no merit to this argument contained within the second assignment of error.

2. Rape

{¶98} Appellant argues that the State failed to prove beyond a reasonable doubt that Appellant committed rape. The elements of rape, R.C. 2907.02(A)(1)(c), are set forth fully above at paragraph #57. Appellant challenges the sufficiency of the evidence on the element of "substantial impairment," asserting that the jury did not have sufficient evidence to conclude that Heather Camp was substantially impaired and therefore unable to give consent to sexual conduct. In our analysis of the first assignment of error, we considered whether there was some evidence tending to prove the material element of substantial impairment in order to properly admit Appellant's confession to having had consensual sex with Heather Camp.

{¶99} The corpus delicti rule is an evidentiary ruling, *State v. Ashe*, 2nd Dist. Montgomery No. 26528, 2016-Ohio-136, at ¶ 9, and is satisfied by "a rather low" evidentiary standard. *State v. Blevins,* 2nd Dist. Montgomery No. 24006, 2011-Ohio-381, at ¶ 27, citing *State v. Barker,* Montgomery App. No. 23691, 2010-Ohio-5744, ¶ 10. However, here a different standard is required. Here we must determine whether the evidence, if believed, reasonably could support a finding of guilt beyond a reasonable doubt.

{¶100} In arguing for a rape conviction, the State pointed out that Appellant shot Heather Camp in the center of the chest and, according to Appellant, returned to his camper in Highland County later and had sex with her. The State pointed to the nipple swabs which indicated Appellant's DNA on both nipples. In closing, the State also pointed to Dr. Casto's testimony. The State argued:

> Her mental state was such that this man had shot her in the chest. * * * At that point you can draw the inference, rely on the circumstantial evidence, that [Heather] was in no physical or mental state to consent or resist the defendant having sexual intercourse with her. And the Defendant knew or should have known that the condition existed, because he caused the condition. In order to prove that the defendant had reasonable cause to believe that Heather's ability to resist or consent was substantially impaired because of a physical or mental condition, you must compare him to an ordinary person. Would an ordinary person who had just shot Heather in the chest believe that Heather's ability to resist or consent was substantially impaired?

{¶101} As indicated above, we have not found other rape cases containing fact patterns in which the "substantial impairment" element was based upon a physical impairment. In analyzing Appellant's conviction pursuant to R.C. 2907.02(A)(1)(c), we find other cases' discussion of other pertinent factors to be instructive. In *State v. Bender*, 3rd Dist. Union No 14-19-22, 2020-Ohio-722, Bender was convicted of rape pursuant to R.C. 2907.02(A)(2): "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." The 3rd District court discussed the legal definition of "fear or duress." On appeal, Bender argued there was insufficient evidence to prove that Bender compelled his victim to engage in sexual conduct by force or threat of force. The appellate court noted:

> (" '[T]he key inquiry for determining whether the State presented sufficient evidence on the element of force is whether the "victim's will was overcome by fear or duress." ' "), *State v. Stevens*, 2016-Ohio-446, 58 N.E.3d 584 (3rd Dist.) at 20, quoting *State v. Wine,* 3d Dist. Auglaize No. 2-12-01, 2012-Ohio-2837, ¶ 40, quoting *In re Forbess,* 3d Dist. Auglaize No. 2-09-20, 2010-Ohio-2826, ¶ 40, citing *State v. Heft,* 3d Dist. Logan No. 8-09-08, 2009-Ohio-5908, ¶ 88, citing *State v. Eskridge*, 38 Ohio St.3d 56, 58-59 (1988). "[I]f the defendant created the belief that physical force will be used in the absence of submission, then threat of force can be inferred"—that is, a "threat of force includes both explicit and implicit threats" because "[n]othing in the rape statute requires the threat of force to be direct or express." *State v. Rupp* at ¶ 33.

{¶102} *See also State v. Schaim,* 65 Ohio St. 3d 51, 1992-Ohio-31, 600 N.E.2d 661, at paragraph one of the syllabus ("The 'force or threat of force' element 'can be inferred from the circumstances surrounding sexual conduct.' "). "In order for a defendant to overcome his victim's will by fear or duress, the defendant would have had to engage in sufficient behavior toward the victim. This behavior is objective and its effect is viewed in light of the totality of facts and circumstances existing at the time of the alleged rape." *Rupp* at ¶ 41. *See also Stevens* at ¶ 21 (" '[T]he amount of force [necessary to prove forcible rape under R.C. 2907.02(A)(2)] must be examined in light of the circumstances.' "), quoting *State v. Runyons,* 3d Dist. Union No. 14-91-30, 1992 WL 136196, *2 (June 9, 1992). *Bender, supra,* at ¶ 30. In Bender's case, the appellate court found that based on the totality of the circumstances, a rational trier of fact could infer that his victim's state of fear or duress during a prolonged period of torture was such that she was compelled to submit to the sexual conduct to end the torture. *See also Thomas,* 6th Dist. Lucas No. L-17-1266, 2019-Ohio-1916, at ¶ 27.

{¶103} In *State v. Salti,* 8th Dist. Cuyahoga No. 106834, 2019-Ohio-149, the defendant appealed multiple convictions of rape and kidnapping of multiple young female victims he met online or through a third person.

Salti's convictions were also brought pursuant to R.C. 2907.02(A)(2). The

appellate court observed:

> "The force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other." *State v. Eskridge,* 38 Ohio St.3d 56, 58, 526 N.E.2d 304 (1988). "Force need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established." S*tate v. Fowler, 27* Ohio App.3d 149, 154, 500 N.E.2d 390 (8th Dist.1985).

*Salti, supra,* at ¶92.

{¶104} In Salti's case, the appellate court found that "the constant

threat of violence caused [the victims] to "agree" to perform oral sex on a

stranger behind a Walgreens store. Then, during the encounter, [the victims]

recognized the stranger as Salti, and Salti threatened them by brandishing a

firearm and a knife. *Id.* at 120. The appellate court found, therefore, there

was sufficient evidence that Salti engaged in sexual conduct with [the

victim] against her will and that he used the threat of force to compel her

submission. Therefore, there was sufficient evidence to support the rape

convictions.

{¶105} Recognizing that *Bender* and *Salti* were not convicted under

the same subsection of the rape statute, we agree with the State's argument

that a reasonable person could make the inference that after Heather Camp

was shot in the chest after struggling with Appellant, that she was substantially physically impaired so as to be unable to give consent to sex. As discussed above relative to *Foster,* Appellant did in fact know that Heather was physically injured since he set in motion the events that caused her to be shot in the chest at close range. He did observe specific signs of impairment and in his interview told Detective Antinore that "she was not 100%", and at his camper she asked for pain pills. It may be inferred that given her physical injuries and substantial physical impairment, Heather knew she would not be able to resist sex with Appellant. As in *Bender,* it may be inferred that Heather may have feared further physical violence if she did not consent to sex. Appellant admitted hitting her in the forehead and the side as they drove prior to the shooting. Heather needed assistance walking into the camper. Given her physical injuries, it is reasonable to infer that Heather knew resistance was or would have been futile.

{¶106} The *Salti* court discussed that force may be subtle and psychological, and that the size and strength of the parties is relevant. The *Salti* court concluded that the "constant threat" to the victims caused them to "agree" to sex. Heather Camp had been hit and shot in the chest at close range. Mandy Knisley described Heather's stature as "tiny." It may be hard to imagine what more could have happened to her, but it is reasonable to

infer that Heather, in her substantially impaired physical state, may have agreed to consensual sex to avoid further violence.

{¶107} For the foregoing reasons we find no merit to Appellant's argument that there was insufficient evidence that Heather Camp was substantially impaired so as to be unable to give consent to sex. We find any rational trier of fact could have found the evidence of substantial impairment beyond a reasonable doubt. Accordingly, we hereby overrule the second assignment of error.

{¶108} Having found no merit to either of Appellant's assignments of error, the judgment of the trial court is affirmed.

**JUDGMENT AFFIRMED.**

# JUDGMENT ENTRY

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to Appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Highland County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. and Hess, J. concur in Judgment and Opinion.

For the Court,

_____
Jason P. Smith
Presiding Judge

## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**