[Cite as *State v. Cutright*, 2021-Ohio-4039.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

| | | |
|---|---|---|
| State of Ohio, | : | Case No. 21CA3749 |
| Plaintiff-Appellee, | : | |
| v. | : | <u>DECISION AND</u> <u>JUDGMENT ENTRY</u> |
| Casey B. Cutright, | : | |
| Defendant-Appellant. | : | **RELEASED 11/09/2021** |

<u>APPEARANCES</u>:

Paul Giorgianni, Giorgianni Law LLC, Columbus, Ohio for appellant.

Jeffrey C. Marks, Ross County Prosecutor and Pamela C. Wells, Ross County Assistant Prosecutor, Chillicothe, Ohio, for appellee.

Hess, J.

**{¶1}** Casey B. Cutright appeals his conviction for felonious assault and endangering children. Cutright contends that there was insufficient evidence to support his conviction and his conviction was against the manifest weight of the evidence because there was insufficient evidence of: (1) "serious" physical harm or (2) that he "knowingly" caused serious physical harm. Cutright also contends that his conviction was barred by the corpus delicti rule, which requires physical evidence of a crime, because he contends the state presented no evidence that the victim suffered serious physical harm beyond Cutright's own confession. Last, Cutright contends that he was deprived of his constitutional right to effective assistance of counsel because his trial attorney failed to object to the admission of his confession and the state's mischaracterization of his conduct.

{¶2} We find that the weight of the evidence supports Cutright's convictions on all counts. The state presented substantial evidence of the facts and circumstances surrounding the assaults to determine that Cutright was aware that his actions would result in serious physical harm to the infant victim J.C. and that his actions did, in fact, cause serious physical harm to J.C. In resolving conflicts in the evidence, the jury did not clearly lose its way or create such a manifest miscarriage of justice that reversal of his felonious assault and endangering children convictions is necessary. We overrule Cutright's first five assignments of error.

{¶3} We also find the corpus delicti rule did not bar the introduction of Cutright's audiotaped confession because the state presented expert medical evidence that J.C. suffered no less than 20 bone fractures that were caused by child physical abuse, not accidental trauma. Cutright was not convicted solely on his confession, but because J.C.'s body had non-accidental fractures on the arms, legs, and ribs, which were areas that Cutright admitted he applied physical force to during bouts of extreme anger. We overrule Cutright's sixth assignment of error.

{¶4} Cutright was not deprived of effective assistance of counsel when his attorney failed to object to the admission of his audiotaped confession on the corpus delicti ground because, as we found in addressing his sixth assignment of error, the state presented evidence that J.C. suffered serious physical harm from child physical abuse. Nor was his counsel deficient for failing to object to the prosecutor's characterization of the hand motions Cutright made in showing the way he applied force to J.C.'s limbs. A state's witness described the method Curtight used as a revving motion, and also a "downward pulling," which can be paraphrased as a "bending" motion. A prosecutor is

entitled to considerable latitude in summarizing the evidence in opening and closing statements and defense counsel's decision whether to object is a trial tactic that we will not disturb. We overrule Cutright's seventh assignment of error and affirm the judgment of conviction.

## I. PROCEDURAL HISTORY

**{¶5}** The Ross County grand jury indicted Cutright on three counts of felonious assault in violation of R.C. 2903.11, second-degree felonies, and two counts of endangering children in violation of R.C. 2919.22, one a second-degree felony and one a third-degree felony. Cutright pleaded not guilty. Prior to trial, the state moved to dismiss the second endangering children count, which was count five of the indictment, a third-degree felony. The trial court orally granted the motion to dismiss count five. A jury found Cutright guilty of three counts of felonious assault and one count of endangering children and the trial court sentenced him to a cumulative 21-year prison term. Cutright appealed, but we dismissed the appeal for lack of jurisdiction. *See State v. Cutright*, 4th Dist. Ross No. 20CA3718, 2021-Ohio-1582 (count five was not terminated by a journal entry, thus the hanging charge prevented the conviction from being a final order under R.C. 2505.02(B) and appeal was dismissed for lack of jurisdiction). Following our dismissal, the trial court issued a written entry dismissing count five. This appeal followed.

**{¶6}** At trial, Ross County Sheriff Deputy Zachary McGoye testified that shortly after midnight in the early morning hours of February 15, 2019, he was called to the Cutright residence on a disorderly conduct report. Defendant Casey Cutright, who was in a truck in the driveway about 100 yards from the residence, informed him that there had been a verbal altercation between himself and his wife Amber Cutright. Deputy McGoye

went up to the residence and spoke to Amber, who asked Deputy McGoye if she could go with her three-month-old infant J.C. to the Adena Regional Medical Center. Deputy McGoye testified that Amber told him that there had been an argument and she wanted to go to the hospital for treatment for both herself and infant J.C. A squad car transported Amber and J.C. to the hospital. Casey Cutright did not go with them.

{¶7} Ross County Sheriff Detective Sergeant Jason Gannon testified that he and two other detectives executed a search warrant at the Cutright residence on February 15, 2019. Nobody was home when they arrived and Sergeant Gannon described the residence as a very dirty mobile home trailer. They were searching for evidence of child abuse and neglect. He found, photographed, and collected two ladies' style bloodied shirts, one white and one zebra print. Ross County Sheriff Detective Max Adair testified that he interviewed Amber at the Domestic Violence Coalition in Chillicothe and she told Detective Adair that a bloodied zebra print shirt would be at the residence.

{¶8} Sheriff Detective Martin Brooks testified that he also participated in the search of the Cutright residence and processed evidence and paperwork related to the search. Detective Brooks testified that he sent DNA swabs from Casey Cutright, Amber Cutright, and J.C. to the Ohio Bureau of Criminal Investigations (BCI) for processing.

{¶9} Detective Tony Wheaton testified that he was the lead detective on the case and learned through his discussion with officials at Adena Regional Medical Center that J.C. had been transported to Nationwide Children's Hospital in Columbus. Detective Wheaton traveled to Nationwide Children's Hospital and spoke to the staff and doctors. Detective Wheaton learned that J.C. suffered approximately 20 or more bone fractures in various states of healing. He photographed J.C. and documented the infant's external

injuries. Detective Wheaton returned to Ross County and interviewed Casey Cutright. Because Detective Wheaton considered Casey Cutright to be a suspect, he advised Cutright of his Miranda rights. Cutright waived his Miranda rights and spoke with Detective Wheaton.

{¶10} Cutright told Detective Wheaton that he moved in with Amber in March 2018, while she was pregnant with J.C. He and Amber married sometime between March 2018 and November 21, 2018, the date that J.C. was born, but he was not J.C.'s biological father. Detective Wheaton testified that Cutright initially stated that neither he nor Amber ever caused any harm to J.C. and that neither of them were violent individuals. However, as Detective Wheaton began to explain J.C.'s injuries and the number and severity of the fractures, Cutright's story changed. Cutright stated that he observed Amber potentially cause injuries to J.C. on eight separate occasions because of her violent tendencies. Cutright continued to maintain that he never personally hurt J.C.

{¶11} Wheaton testified that later that same day he conducted a second interview of Casey Cutright that was audiotaped and during this second interview Cutright admitted harming J.C. on three occasions. Wheaton testified that during the first instance Cutright was holding J.C. when Amber began to yell at Cutright. Cutright told him that he became angry, may have had a flashback, and squeezed J.C.'s arms in a very strong and violent manner while pushing them down. While doing this, Cutright felt and heard a popping sound. Detective Wheaton asked Cutright to show him how this was done. Detective Wheaton testified that Cutright demonstrated "with his thumbs kind of in an upward position, that he was holding [J.C.'s] arms above the elbows up towards the shoulders with his thumbs in a slightly upward position. States he became extremely angry,

squeezing and twisting as he rotates his hands and his thumbs down almost like you're revving up a motorcycle in a downward position while also pulling down." Detective Wheaton testified that Cutright told him he was hoping the sound was just a dislocation and that he had not broken one or both of J.C.'s arms.

**{¶12}** Detective Wheaton testified that Cutright described a second incident that a similar rage came upon him while he was changing J.C.'s diaper. During that incident Cutright was holding J.C.'s legs above the knees and up into the thigh area. Cutright explained that while he was changing J.C.'s diaper, Amber yelled at him and threw a Hot Wheels car at him, which hit Cutright in the head. In a fit of rage, Cutright squeezed and twisted J.C.'s legs as he pulled J.C. towards him. Detective Wheaton testified that Cutright showed him the manner in which Cutright inflicted the injury and it was "in the same fashion, he shows that his arms were like this and once again it's a downward and a twisting motion while he's pulling [J.C.] to him." Again, Cutright heard and felt a popping sound and hoped that he had only dislocated a knee or pulled a leg out of the hip socket instead of breaking it, but acknowledged it could have been a break.

**{¶13}** Detective Wheaton testified that the third incident Cutright described involved J.C.'s chest and shoulder area. Again, Cutright explains that Amber was yelling and Cutright had another flashback and grabbed J.C. underneath the armpits and very violently brought J.C. up to his chest. While doing this, Cutright felt and heard a popping sound, but hoped that it was only a dislocated shoulder and that J.C.'s ribs and arms were not broken. Cutright admitted to Detective Wheaton that he had been lying earlier because he did not want to look like a bad guy.

**{¶14}** The state played the audiotape of Detective Wheaton's second interview with Casey Cutright to the jury.[1] In the audiotaped confession, Cutright first described an incident during which he, Amber, his aunt, and his grandmother were all playing with J.C. at the grandmother's house. Cutright states that he grabbed J.C. under the arms to prevent the infant from falling and felt a pop and J.C. started screaming. Cutright stated that he believed he had hurt J.C. but did not know how badly because J.C. had calmed down. Then Cutright explained the three incidents that Detective Wheaton had previously testified about, when Cutright may have had flashbacks and knew he had hurt J.C. because Cutright was angry. It was these three incidents that resulted in the criminal charges against Cutright.

**{¶15}** On the audiotape, Cutright described an incident, charged as count one in the indictment (second degree felonious assault), after Christmas 2018 but before New Year's Day 2019 during which Amber and he were discussing J.C.'s biological father and a possible DNA test. The discussion turned into an argument while J.C. was on Casey Cutright's lap.

---

[1] Cutright filed a motion in the appeal in which he contends that certain portions of the audiotape were inaccurately transcribed. He argued that these defects were immaterial because the court can listen to the audiotape itself. He presented his interpretation of the audiotape in his brief and requested that we order the trial transcript modified for accuracy if we were to rely on the transcript exclusively. We reserved ruling on his motion because the audiotape was made part of the record. Whenever an audio or video tape is part of the record, we review it as well as the court reporter's transcription of it. Here, we listened repeatedly and extensively to it, compared our understanding of it with the trial transcript and again with the interpretation Cutright provides in his brief. The interview was difficult at times to understand because occasionally Cutright and Wheaton spoke over each other or Cutright mumbled inaudibly, and there was at least one instance in which Cutright spoke with indecipherable speed. The differences between Cutright's version and the official transcript occur when Cutright begins a sentence or ends a sentence and immediately cuts off or is cut off by Wheaton, resulting in the omission of a word or two of Cutright's statement. Upon review, we find that the differences are substantively immaterial to the issues on appeal. Our interpretation differs materially from the transcript, but without legal significance, on one occasion, which we explain in footnote 2. We deny Cutright's request to have the entire audiotape re-transcribed due to the immaterial nature of the discrepancies.

Mr. Cutright: Yea and he smiling having fun and then when she started yelling he started crying. And then I'm sitting there I was actually trying to calm him down and then she just –

Mr. Wheaton: Just kept building on ya.

Mr. Cutright: yea.

Mr. Wheaton: So were you, and [J.C.] was crying --

Mr. Cutright:  Yea and I didn't know what to do so I squeezed [J.C.'s] arms.

Mr. Wheaton: And was it his upper arms or lower arms? His upper arms.

Mr. Cutright: Yea right in here –

Mr. Wheaton: Around his elbows or something?

Mr. Cutright: Yea.

Mr. Wheaton: And you told me that you heard something and or felt something?

Mr. Cutright: Yea and I asked her if I could take him to the hospital.

Mr. Wheaton: Did you feel this in both arms or just one arm?

Mr. Cutright: I felt like one but it could have been both. Then I knew he was hurt.

Mr. Wheaton: You knew at this point they were either broken or popped out of socket?

Mr. Cutright: Yes. And I was [inaudible] because I'm not, I'm not a violent person. I'm not.[2]

Mr. Wheaton: And I'm sure [J.C.] is just screaming bloody murder at this point?

Mr. Cutright: Yea after a while I did get him calmed down, he was fine.

---

[2] The only material difference in the audiotape, the transcript, and Cutright's brief is in this response, which we interpret above. The transcript provides: "Yea. And I was trying to walk him and pop them back in socket because I was like –" Cutright's brief offers: "Yes. And I was like, actually I'm hoping they were just out of socket, because I'm not, I'm not a violent person. I'm not." We find that the speed of Cutright's speech makes a portion of this statement indecipherable and marked it "inaudible."

**{¶16}** Cutright explains that J.C. was approximately eight pounds at the time. Cutright weighed approximately 250 pounds. Cutright describes a second incident in the middle of January 2019, charged as count two in the indictment (second degree felonious assault), when he was changing J.C.'s diaper and Amber got moody and threw a Hot Wheels car at Cutright:

> Mr. Wheaton: So tell me about the next time, what do you remember there? Take your time I know it's hard.
>
> Mr. Cutright: It was uh, the legs.
>
> Mr. Wheaton: Ok, what were you doing?
>
> Mr. Cutright: Changing his diaper.
>
> Mr. Wheaton: Ok.
>
> Mr. Cutright: And he was crying and stuff, you know a baby cries when they get changed.
>
> Mr. Wheaton: Sure.
>
> Mr. Cutright: And it wasn't bothering me. I just got done taking my [inaudible] – everything was fine, she was getting moody but I tried to ignore it. I get a diaper on and she launched a Hot Wheel at me. When it hit me –
>
> Mr. Wheaton: It just set you on fire.
>
> Mr. Cutright: Yea. But I didn't want to do anything. I just wanted to calm down.
>
> Mr. Wheaton: But you didn't calm down did you?
>
> Mr. Cutright: No.
>
> Mr. Wheaton: What did you do.
>
> Mr. Cutright: Squeezed his legs.
>
> Mr. Wheaton: And I think you, you felt or heard something then didn't you?
>
> Mr. Cutright: Felt like, it felt like a kneecap type deal. I was like, well.

Mr. Wheaton: Which leg? Or both of them?

Mr. Cutright: The right.

Mr. Wheaton: The right one? So you felt that maybe his kneecap popped out of place or like broke or something?

Mr. Cutright: Yea, because uh I looked at her and I was like "Look, let's take him to the hospital."

{¶17}  Cutright admitted that he wanted to schedule a session with his psychiatrist because he was having difficulty controlling his anger and he wanted help to keep from hurting J.C. Cutright admitted that he hurt J.C. a third time in mid-February 2019, which was count three of the indictment (a second-degree felonious assault charge), when he grabbed J.C. around both sides of his chest and pulled on him and injured his chest and armpit areas:

Mr. Wheaton: You were in there, and her and [J.C.] are in bed and she started yelling at you?

Mr. Cutright: And I had a flashback of when my step-dad was yelling and throwing things at my mom, smashing in particular, and I remember me getting my brother and sister out of the way and all I could think was get him out of the way, so I picked him up by his onesie quick and I wanted him out of there because I didn't want him exposed to yelling all the time, and yea I heard a pop, but I figured it could have been anything.

Mr. Wheaton: This popping, was this his arms and his ribs again?

Mr. Cutright: Yea. And I just wanted him out of the yelling I didn't want him –

Mr. Wheaton: What side, what side of his chest? Was it both sides or just one side?

Mr. Cutright: Felt like more here. It did felt like more up here but –

Mr. Wheaton: And his upper arms and stuff?

Mr. Cutright: Yea because when I yanked him, I just wanted him out of that room quick.

Mr. Wheaton: You did it really forcefully, you were mad again once again, so you grabbed him –

Mr. Cutright: Well, mad and –

Mr. Wheaton: Jerked him up to you real quick.

**{¶18}** Cutright summarized two of the three instances when he became angry and hurt J.C., admitted that he knew that he was hurting J.C., and that he initially lied about it because he was concerned about appearing criminal:

Mr. Wheaton: Ok. So there was three separate times because you got really angry that you knew you had caused injury to [J.C.].

Mr. Cutright: And the one, and the one where I was playing, yea.

Mr. Wheaton: Ok, and that was at your grandma's house – but we're dealing with the three things here at your house, you know, the time from after Christmas but before January, you got real mad and you grabbed him by both arms and the chest area and you knew they either broke or they popped out of socket – you were hoping that they popped out of socket.

Mr. Cutright: Yes.

Mr. Wheaton: You know he's awfully small. Then the next time that you, at least the next one that you can clearly specifically remember was maybe around the middle of January, when you were changing his diaper and you know he was crying, she was barking at you again, you got mad –

Mr. Cutright: Yea when she threw the Hot Wheels at me.

Mr. Wheaton: Yea, and you had hold of his legs and you felt that pop again. You thought this time, you thought it was his knees that popped out.

Mr. Cutright: I had his legs getting ready to move them and put the diaper on. And it was just like at that instance when that hit I just—

Mr. Wheaton: You got really mad and you squeezed hard.

Mr. Cutright: And when I seen that, I just felt, bad. Because I was just changing his diaper.

*          *          *

Mr. Wheaton: Ok, so let me ask you this, based on your behavior, you're getting angry, you knowing that you caused injuries to [J.C.] because of your anger, you were trying to seek a psychiatrist to try to keep you from hurting [J.C.] further.

Mr. Cutright: Yea, because I'm not a violent person. I do not, I don't even like violence.

Mr. Wheaton: But you're hurting [J.C.] fairly regularly.

Mr. Cutright: Yea. That's why I was looking for help. * * * .

* * *

Mr. Wheaton: So what were you afraid of by not telling me the truth at the beginning of it?

Mr. Cutright: I just didn't want to look like a criminal, I'm not. * * * .

**{¶19}** Dr. Michelle Greene, a physician at Nationwide Children's Hospital, testified as an expert in child abuse pediatrics. Dr. Greene testified that an infant under the age of three months would not be expected to be rolling over, sitting up, or standing and/or walking and therefore not able to cause themselves bruises. Dr. Greene examined J.C., noted that he appeared markedly thin, and took photographs of scratches and bruises on him during her examination. X-rays of J.C. showed multiple fractures all over his body, including 20 healing fractures. Dr. Greene testified, "There were fractures on his ribs on the left side, he had fractures on the left upper arm, the left lower arm, both of his hands, both of his legs, upper leg and lower legs. They had many fractures."

**{¶20}** Dr. Greene testified that J.C. did not have a bone disease or a family history of bone disease that might cause fractures. Therefore, in a child of J.C.'s age there should be no bone fractures. The multitude of fractures J.C. had in various parts of his body did not fit with a possible single accidental cause for the injuries. Additional testing of J.C. ruled out any possible bleeding disorder, vitamin D deficiency, or genetic bone disorders.

Dr. Greene diagnosed J.C. with child physical abuse with a reasonable degree of medical certainty. Dr. Greene also testified that J.C. gained an unexpected amount of weight while in the hospital where he was receiving the appropriate amount of food, which meant that at home he was not being fed the amount of food he was supposed to receive.  Dr. Greene testified that if someone were to take J.C.'s limbs and squeeze it and bend it down, like a motion similar to revving a motorcycle, it would be sufficient to break J.C.'s bones.

{¶21}  In her initial report, Dr. Greene's preliminary findings were that J.C.'s failure to thrive "would be consistent with severe neglect should no organic cause be identified and [J.C.] gains weight with appropriate nutrition while hospitalized,"  "the multiple healing fractures identified in this child are highly concerning for physical abuse" and "[t]he constellation of injuries identified in [J.C.] is consistent with a diagnosis of child physical abuse, pending further evaluation * * *." After further evaluation, Dr. Greene's final report concluded that her preliminary impressions were the same as outlined in her final evaluation, "[J.C.]'s injuries are consistent with a diagnosis of physical abuse."

{¶22}  Dr. Brent Adler, an expert pediatric radiologist for Nationwide Children's Hospital, testified that he was involved with the treatment and care of J.C.  Dr. Adler testified that J.C. had a skeletal survey performed via x-ray and approximately 24 films were produced of J.C.'s body. Dr. Adler testified that J.C. had healing fractures that were two to six weeks old. J .C. had four healing fractures on four of his ribs near the armpit area, which are typically caused by squeezing or punching. J.C. also had a healing fracture on his left arm bone above the elbow; two healing fractures on the left arm bones below the elbow, one up by the elbow and a second by the wrist; two healing fractures in the right arm bones below the elbow; two healing fractures in the right wrist bones leading

to the right index and middle fingers; a healing fracture in the left wrist bone leading to the left index finger; two healing fractures in the left leg/thigh bone, one by the hip and one by the knee; possible right leg/thigh bone healing fracture by the hip; two healing fractures in the left larger lower leg bone below the knee, one by the knee and the other by the ankle; a fracture on the left smaller lower leg bone; two fractures on the right larger lower leg bone; and a healing fracture on the right smaller lower leg bone near the knee.

**{¶23}** Dr. Adler testified that there was nothing in the films to indicate that J.C. had a disease called "osteogenesis imperfecta" that would cause brittle bones or easily broken bones. Dr. Adler determined the cause of the bone fractures was non-accidental trauma. The fractures would have occurred with force, not by a three-month-old infant's normal movements, and could be cause by a motion like the movement involved in the revving of a motorcycle. Dr. Adler testified that J.C. would have suffered a substantial amount of pain from any movement, at least for approximately seven days, while the bones healed because a fractured bone that is not mobilized is painful every time it moves.

**{¶24}** J.C.'s medical records, physician reports, and photographs were admitted into evidence.

**{¶25}** In Cutright's defense, two of Cutright's friends testified that they would hang out and play video games at Cutright's house several times a week where Cutright lived with Amber and J.C. and they never observed any interaction between Cutright and J.C. Mildred Frey testified that she was Casey Cutright's aunt; she interacted with Casey, Amber, and J.C., and she never observed any interaction between Casey Cutright and J.C. Andrew Sabora testified that he was Casey Cutright's brother and he met Casey's wife Amber for the first time at their wedding. Sabora testified that he lived with the

Cutrights for approximately two weeks from the end of November 2018 until December 14, 2018. Sabora testified that he lived with them because "I was in a bad area myself and he [Casey] offered to take me in, help me get a job and get back started with life." Sabora testified that he was also there on behalf of children's services "to look after them to make sure they're being proper parents." Sabora testified that during that time, he never saw Casey or Amber Cutright mistreat J.C. in any way; both Casey and Amber shared parenting responsibilities "half and half most of the time."

**{¶26}** Casey Cutright testified that his admissions made to Detective Wheaton, which were on the audiotape played for the jury were "not accurate." Cutright testified that he only admitted to harming J.C. so that he could go home, "I just thought of something just to say trying to go home." Cutright denied ever harming J.C. in any way and instead testified that he saw Amber harm J.C. Cutright testified that even though Amber weighed only about 100 pounds and he weighed 250 pounds, she was able to prevent him from taking J.C. to the hospital for treatment because "all it takes is one phone call of me kidnapping or taking away child [sic] from her."

**{¶27}** On cross examination, Cutright admitted that he was showing Detective Wheaton a motion with his hands, but never stated that he was "bending" J.C. Cutright stated that the first instance he described to Detective Wheaton was a lie – J.C. was not even in the house at the time. The entire first incident was made up. Cutright testified that the second incident during which Cutright told Detective Wheaton that Amber hit him with a Hot Wheels and he grabbed J.C.'s legs and twisted them, was also fabricated and did not happen. Cutright admitted that the third incident, where he grabbed J.C. under the armpits, did happen, but that he "did not snatch him up so bad that it hurt him, no."

**{¶28}** After his judgment of conviction was finalized, Cutright filed this appeal.

## II. ASSIGNMENTS OF ERROR

**{¶29}** Cutright assigns the following seven errors for our review:

1.      There is insufficient evidence: (a) that the conduct charged in Count 1 caused "serious physical harm" and (b) that Mr. Cutright "knowingly" caused serious physical harm as charged in Count 1. (R., *passim.*)

2.      There is insufficient evidence: (a) that the conduct charged in Count 2 caused "serious physical harm" and (b) that Mr. Cutright "knowingly" caused serious physical harm as charged in Count 2. (R., *passim.*)

3.      There is insufficient evidence: (a) that the conduct charged in Count 3 caused "serious physical harm" and (b) that Mr. Cutright "knowingly" caused serious physical harm as charged in Count 3. (R., *passim.*)

4.      If there is insufficient evidence of "serious physical harm," then the trial court erroneously characterized the endangering children conviction as a felony. (R. 33, Entry (Mar. 9, 2020); R. 42, Judgment Entry Sentence 2, *ll.* 1-2 (May 11, 2020).)

5.      The verdict is contrary to the manifest weight of the evidence as to: (a) Count 1, (b) Count 2, and (c) Count 3. (R., *passim.*)

6.      The convictions, on all four counts, are barred by the *corpus delicti* rule. (R., *passim*)

7.      Mr. Cutright was deprived of his constitutional right to effective assistance of counsel. (Failure to object to admission of confession: Tr. I:131-157. Failure to object to the State's mischaracterizations of Mr. Cutright's conduct: Tr. I:76:6-9, 206:5-8; Tr. II:30:16-31:2, 31:9-11, 118:9-10, 118:22-119:1, 122:22-123:4.)

## III. LEGAL ANALYSIS

**{¶30}** For ease of analysis, we will review Cutright's first five assignments of error in a modified order.

A. Standard of Review – Insufficiency and Manifest Weight of the Evidence

**{¶31}** "When a court reviews the record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond

a reasonable doubt.' " *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 146, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). A sufficiency assignment of error challenges the legal adequacy of the state's prima facie case, not its rational persuasiveness. *State v. Koon*, 4th Dist. Hocking No. 15CA17, 2016-Ohio-416, ¶ 17. "That limited review does not intrude on the jury's role 'to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *Musacchio v. United States*, 577 U.S. 237, 136 S.Ct. 709, 715, 193 L.Ed.2d 639 (2016), quoting *Jackson* at 319, 99 S.Ct. 2781.

**{¶32}** By contrast, in determining whether a criminal conviction is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that reversal of the conviction is necessary. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119. To satisfy this test, the state must introduce substantial evidence on all the elements of an offense, so that the jury can find guilt beyond a reasonable doubt. *See State v. Eskridge*, 38 Ohio St.3d 56, 526 N.E.2d 304, syllabus (1988).

**{¶33}** When an appellate court concludes that the weight of the evidence supports a defendant's conviction, this conclusion necessarily includes a finding that sufficient evidence supports the conviction. *State v. Pollitt,* 4th Dist. Scioto No. 08CA3263, 2010-Ohio-2556, ¶ 15. " 'Thus, a determination that [a] conviction is supported by the weight of

the evidence will also be dispositive of the issue of sufficiency.' " *State v. Lombardi,* 9th Dist. Summit No. 22435, 2005-Ohio-4942, ¶ 9, quoting *State v. Roberts,* 9th Dist. Lorain No. 96CA006462, 1997 WL 600669 (Sept. 17, 1997); *State v. Smith*, 2020-Ohio-5316, 162 N.E.3d 898, ¶ 30-32 (4th Dist.).

**{¶34}** Because Cutright asserts that his convictions on the three felonious assault counts were against the manifest weight of the evidence, and the felonious assault convictions and endangering children conviction were unsupported by sufficient evidence, we will begin with the manifest weight analysis. *Id.* at ¶33; *State v. Schroeder,* 2019-Ohio-4136, 147 N.E.3d 1, ¶ 59-65 (4th Dist.); *State v. Anderson,* 4th Dist. Highland No. 18CA14, 2019-Ohio-395, ¶ 13-15.

### B. Felonious Assault Convictions

**{¶35}** The state alleged that Cutright engaged in three incidents of felonious assault in violation of R.C. 2903.11, which states, "No person shall knowingly do either of the following: (1) Cause serious physical harm to another * * *." R.C. 2901.22(B) defines "knowing" as:

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature.

Acting "knowingly" is different from acting "purposely." Under R.C. 2901.22(A), a "person acts purposely when it is the person's specific intention to cause certain result * * *." The state did not have to prove that Cutright intended to cause serious physical harm to J.C. when he squeezed him, only that Cutright was aware that squeezing J.C. would probably cause serious physical harm to the infant. The trial court provided the jury with the appropriate additional instruction: "Since you cannot look into the mind of another,

knowledge is determined from all the facts and circumstances in evidence. You will determine from these facts and circumstances whether there existed at the time in the mind of the Defendant, an awareness of the probability that his conduct would result in serious physical harm to another."  *See State v. Johnson*, 4th Dist. Scioto No. 13CA3580, 2014-Ohio-4443, ¶ 14. " '[T]he jury, unable to enter the mind of another, is required to consider common-sense, causal probabilities in considering whether the defendant acted "knowingly." ' " *Id.* at ¶ 18 quoting *State v. Kelly*, 11th Dist. Portage No. 2010–P–0049, 2012–Ohio–523, ¶ 23. "[I]f a given result is probable, a person will be held to have acted knowingly to achieve it because one is charged by the law with knowledge of the reasonable and probable consequences of his own acts." *Id.* at ¶15.

**{¶36}** "Serious physical harm" is defined in R.C. 2901.01(A)(5) and means any of the following:

> (a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
> * * *
> (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
> * * *
> (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

In discussing "serious physical harm," we have found:

> "The degree of harm that rises to the level of 'serious' physical harm is not an exact science, particularly when the definition includes such terms as 'substantial,' 'temporary,' 'acute,' and 'prolonged.' "  The statute does not define "substantial suffering"; instead, the trier-of-fact must determine its existence from the facts of each particular case. (Citations omitted.)

*State v. Adams*, 2016-Ohio-7772, 84 N.E.3d 155, ¶ 26 (4th Dist.).

> Courts have also determined that "serious physical harm" exists " 'where the injuries caused the victim to seek medical treatment.' " *Scott, supra,* at

¶ 3. *State v. Muncy,* 4th Dist. Scioto No. 11CA3434, 2012-Ohio-4563, 2012 WL 4513830, ¶ 23, quoting *State v. Sharp,* 12th Dist. Butler No. CA2009– 09–236, 2010-Ohio-3470, 2010 WL 2891777, ¶ 11. *See also Mango, supra,* at ¶ 34. In *Scott,* the testimony established that the victim did visit a hospital.

*Id.* at ¶ 30; *State v. Swain,* 4th Dist. Ross No. 01CA2591, 2002-Ohio-414 (infant's multiple bone fractures in ankles, legs, and wrists constituted serious physical harm).

**{¶37}** Both Detective Wheaton's testimony concerning his interview with Cutright and the audiotaped confession established that on three different occasions Cutright became violently angry and (1) squeezed and twisted J.C.'s arms and heard and felt a popping sound; (2) squeezed and twisted J.C.'s legs and again heard and felt a popping sound; and (3) grabbed, squeezed, and pulled J.C.'s ribcage under the arms and heard and felt a popping sound. Medical testimony established that J.C. suffered broken arm bones, leg bones, and ribs, which was consistent with the popping sounds Cutright heard as he squeezed and twisted J.C.'s arms and legs and squeezed and pulled on his ribs. The medical testimony also established that it was possible to break J.C.'s bones by squeezing the ribs and by a squeezing and twisting motion of the legs and arms – like the revving motion Cutright described to Wheaton during the interview. And Dr. Adler testified that J.C. would have been in a great deal of pain for at least seven days due to the failure to have his bones immobilized. Cutright was a 250-pound adult male and J.C. was a seven to eight-pound, three-month-old infant.

### 1. Cutright Acted Knowingly

**{¶38}** In Cutright's brief, as to each of the three incidents he "acknowledges that there is sufficient evidence for the jury to have concluded that he 'knowingly' caused 'physical harm' " – a misdemeanor, but not that he knowingly caused serious physical

harm – a felony. He argues that the most the jury could reasonable infer is that he was "reckless."

**{¶39}** Because the jury could not peer into Cutright's mind, it must look at the facts and circumstances that existed at the time, using common-sense and causal probabilities in considering whether Cutright acted knowingly. The state presented evidence that Cutright was a 250-pound adult male and J.C. was a "markedly thin" three-month-old infant. Cutright became exceptionally angry when agitated, and chose to vent his anger by squeezing and twisting the legs and arms of a three-month-old infant and grabbing, squeezing, and pulling on the infant's ribs. Each time Cutright vented his anger on J.C., he heard J.C.'s body make popping noises that he believed were either the sounds of breaking bones or dislocations. Cutright applied sufficient force to J.C. on three separate occasions to cause J.C.'s bones to "pop" and fracture. The medical experts testified that the "revving" motions performed with sufficient force would cause the arm and leg bones to break and a sufficiently powerful squeezing force around J.C.'s ribs would cause them to fracture.

**{¶40}** The state presented substantial evidence for the jury to determine that it was probable that a 250-pound adult male venting his anger out by squeezing, twisting, and pulling on a markedly thin three-month-old infant would cause fractures of his arms, legs, and ribs. Because these fractures were probable and the law charges Cutright with knowledge of the probable consequences of his own acts, the jury properly determined that Cutright acted knowingly. J.C.'s fractures were the reasonable and probable consequences of Cutright's actions.

## 2. Cutright Caused Serious Physical Harm

{¶41} J.C. suffered serious physical harm as the result of physical abuse. The medical experts identified at least 20 different healing bone fractures, determined that they were caused by physical abuse, and testified that J.C. would have suffered a great deal of pain each time the broken bones were moved. Broken bones constitute serious physical harm because they require hospitalization, involve temporary, substantial incapacity, and involve acute pain of such duration as to result in substantial suffering or prolonged intractable pain.

{¶42} Although the state introduced substantial, uncontroverted evidence that J.C. suffered serious physical harm, Cutright argues that there was insufficient evidence that *he* caused serious physical harm because Amber could have been the perpetrator.[3] However, there was scant evidence presented to the jury at Cutright's trial that Amber harmed J.C. None of Cutright's defense witnesses testified that they saw Amber harm J.C. and Cutright's own testimony was vague. The full extent of Cutright's testimony concerning Amber was that he saw Amber harm J.C. "a couple of times, yes" and that she would "hit [J.C.]" and "drag him under water and just pull him around like he was a toy." However, Cutright gave several conflicting stories to Detective Wheaton, initially admitted to lying to Detective Wheaton because he was concerned about appearing criminal, and then recanted his audiotaped confession at trial and testified that he was lying about lying. The jury weighed Cutright's credibility and was free to disbelieve his recantation in its entirety.

---

[3] Cutright contends that Amber "was charged with four counts of endangering children and pled guilty to two." However, any criminal indictment for misdemeanor and/or felony endangering children and any subsequent plea agreement by Amber are not part of the record.

**{¶43}** Cutright also argues that his audiotaped confession that the popping noise was a dislocation is insufficient to establish "serious physical harm" because he failed to complete high school and has a borderline IQ. Therefore, his testimony about bone dislocations is pure medical speculation and not competent evidence of "serious physical harm." That might be true if that was all the jury had to go on. However, two medical pediatric experts from Nationwide Children's Hospital testified. These experts established undisputed evidence that J.C. suffered at least 20 different bone fractures in his legs, arms, wrists, and ribs that were caused by non-accidental trauma. Dr. Greene diagnosed J.C. with physical child abuse. Thus, the jury had substantial medical evidence to conclude that the "popping" sounds Cutright heard were not dislocations, as Cutright had speculated, but were in fact the sound of J.C.'s bones fracturing under the angry force of a 250-pound adult male.

**{¶44}** Upon review of the entire record, including Detective Wheaton's testimony, the audiotaped interview of Cutright, and the medical testimony and exhibits and all reasonable inferences therefrom, we find that the state introduced substantial evidence that Cutright "knowingly" caused "serious physical harm" to J.C. Detective Wheaton testified about the three instances in which Cutright became enraged and squeezed J.C. until he heard popping noises in J.C.'s arms, legs and ribs. In the audiotaped confession, Cutright described the three incidents in detail and testified that he knew he had hurt J.C. and believed that he had either broken J.C.'s bones or dislocated them, but hoped that the bones were only dislocated. The medical experts testified that J.C.'s arm, leg, and rib bones were fractured in multiple locations from physical abuse, not accidental trauma. The jury did not clearly lose its way in finding Cutright guilty of three felonious assault

counts, nor did it create such a manifest miscarriage of justice that reversal of the conviction is necessary.

**{¶45}** Because the manifest weight of the evidence supports Cutright's felonious assault convictions, this conclusion necessarily includes a finding that sufficient evidence supports the convictions.

**{¶46}** We overrule Cutright's first, second, third, and fifth assignments of error.

### C.  Endangering Children Conviction as a Felony

**{¶47}** Cutright contends that his conviction for endangering children should not be characterized as a felony if we sustain his first three assignments of error on the ground that the state failed to establish the "serious physical harm" element. He argues that if we sustain his "serious physical harm" error on the felonious assault counts, we must also modify the judgment of conviction for endangering children to a misdemeanor because that count is based on the three felonious assault counts. However, because we find that the state provided substantial evidence of "serious physical harm" for purposes of the felonious assault counts, we necessarily reject this argument.

**{¶48}** We overrule Cutright's fourth assignment of error.

### D. The Corpus Delicti Rule Does Not Apply

**{¶49}** In his sixth assignment of error, Cutright argues that his convictions are barred by the corpus delicti rule.  Under this rule, there must be some evidence outside of a confession, tending to establish the corpus delicti, before such confession is admissible. A court may not admit an extrajudicial confession unless the state has produced independent evidence of the corpus delicti of a crime. *State v. Carver*, 2020-Ohio-4984, 160 N.E.3d 746, ¶ 53 (4th Dist.). "The corpus delicti of a crime is essentially

the fact of the crime itself." *State v. Hofer,* 4th Dist. Adams No. 07CA835, 2008-Ohio-242,

¶ 36. "This court has stated that the 'corpus delicti' of a crime is 'the body or substance

of the crime and usually [has] two elements: (1) the act itself, and (2) the criminal agency

of the act.' " *State v. Cook,* 128 Ohio St.3d 120, 2010-Ohio-6305, 942 N.E.2d 357, ¶ 23.

> [T]he Supreme Court of Ohio noted the historical origins of the corpus delicti
> rule were designed to protect an accused from being convicted of a crime
> that never occurred. The court stated that, in light of the "vast number of
> procedural safeguards protecting the due-process rights of criminal
> defendants, the *corpus delicti* rule is supported by few practical or social-
> policy considerations." Accordingly, there is "little reason to apply the rule
> with a dogmatic vengeance." The burden upon the state to provide some
> evidence of the corpus delicti is minimal. (Citations omitted.)

*In re W.B. II,* 4th Dist. Highland No. 08CA18, 2009-Ohio-1707, ¶ 35.

{¶50} Cutright did not object to the admission of his audiotaped confession at trial

so he has forfeited all but plain error. *State v. Puckett,* 191 Ohio App.3d 747, 2010-Ohio-

6597, ¶ 14 (4th Dist.). Cutright must establish: (1) that an error occurred, i.e. a deviation

from a legal rule; (2) that the error is a plain, i.e., an obvious defect in the proceedings;

and (3) that this obvious error affected substantial rights, i.e., affected the trial outcome.

*State v. Lykins,* 2017-Ohio-9390, 102 N.E.3d 503, ¶ 5 (4th Dist.).

{¶51} Here, the record contains evidence to satisfy the corpus delecti rule.

Specifically, there is medical evidence and expert testimony that J.C. suffered serious

physical harm and that this harm was inflicted upon him through child physical abuse, not

by accidental trauma. In other words, the corpus delicti here is the multi-fractured body of

three-month-old J.C. along with the testimony from the expert physicians that the

fractures were the result of physical abuse.  This is direct evidence that J.C. was the

victim of non-accidental trauma and suffered serious physical harm; it is sufficient to

satisfy the prosecution's minimal burden under the corpus delecti rule.

**{¶52}** Cutright asserts that someone other than he might have been responsible for J.C.'s injuries because J.C. appeared to have more fractures than could have been explained by the three incidents with which Cutright was charged. "However, the identity of the criminal agent is not part of the corpus delicti, since the purpose is simply to establish that the crime occurred. Nor is it necessary to establish that the evidence exclude all other reasonable theories." (Citations omitted.) *State v. Van Hook*, 39 Ohio St.3d 256, 262, 530 N.E.2d 883 (1988).   "Ohio does not require evidence upon all elements of the crime but only 'some material element.' " *Id.*

**{¶53}** Cutright also contends that the state introduced his audiotaped confession "before presenting independent evidence of any of the three incidents." We understand this argument to mean that the order in which the state presented the expert medical testimony meant that the state's corpus delicti evidence was introduced to the jury after the state played Cutright's audiotaped confession instead of before it. However, as the state explains, had Cutright objected, the trial court could have ordered the audiotape confession played after the medical experts' testimony.

**{¶54}** We overrule Cutright's sixth assignment of error.

### E. Ineffective Assistance of Counsel

**{¶55}** In his final assignment of error Cutright contends that his conviction should be reversed based on ineffective assistance of counsel. Specifically, he argues that his trial counsel: (1) failed to object to the admission of Cutright's out of court confession under the corpus delicti rule; and (2) failed to object to the state's mischaracterizations of Cutright's conduct.

{¶56} To establish constitutionally ineffective assistance of counsel, a criminal defendant must show (1) that his or her counsel's performance was deficient and (2) that the deficient performance prejudiced the defense and deprived him or her of a fair trial. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Accord State v. Issa,* 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001); *State v. Goff,* 82 Ohio St.3d 123, 139, 694 N.E.2d 916 (1998). "In order to show deficient performance, the defendant must prove that counsel's performance fell below an objective level of reasonable representation. To show prejudice, the defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *State v. Conway,* 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 95. "Failure to establish either element is fatal to the claim." *State v. Jones,* 4th Dist. Scioto No. 06CA3116, 2008-Ohio-968, ¶ 14.

{¶57} When considering whether trial counsel's representation amounts to deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Strickland* at 689, 104 S.Ct. 2052. Thus, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Quotation omitted.) *Id.* "A properly licensed attorney is presumed to execute his [or her] duties in an ethical and competent manner." *State v. Taylor,* 4th Dist. Washington No. 07CA11, 2008-Ohio-482, ¶ 10, citing *State v. Smith,* 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). Therefore, a defendant bears the burden to show ineffectiveness by demonstrating that counsel's errors were so serious that he or she failed to function as

the counsel guaranteed by the Sixth Amendment. *State v. Gondor,* 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 61.

**{¶58}** "Furthermore, courts may not simply assume the existence of prejudice, but must require that prejudice be affirmatively demonstrated." *State v. Walters,* 4th Dist. Washington Nos. 13CA33, 13CA36, 2014-Ohio-4966, ¶ 24*; State v. Jones,* 2018-Ohio-239, 104 N.E.3d 34, ¶ 21-24 (4th Dist.). We have repeatedly recognized that speculation is insufficient to establish the prejudice component of an ineffective assistance of counsel claim*. E.g., State v. Dailey,* 4th Dist. Adams No. 18CA1059, 2018-Ohio-4315, ¶ 33 and cases cited therein. *State v. Thacker*, 4th Dist. Lawrence No. 19CA18, 2021-Ohio-2726, ¶ 54-57.

1. Corpus Delicti Rule

**{¶59}** Cutright argues that his attorney's failure to object to the admission of his audiotaped confession under the corpus delicti rule constituted ineffective assistance of counsel. He contends that without his confession, the state had no case, no corroborating evidence, "indeed, no evidence at all, other than the medical evidence of [J.C.'s] condition – this case screamed out for a corpus delicti objection."

**{¶60}** However, as we found when analyzing Cutright's corpus delicti argument in his sixth assignment of error, the medical evidence established the corpus delicti – the multi-fractured body of a three-month-old infant and the expert medical testimony that the serious physical harm was caused by child physical abuse was direct evidence of the crime. As we explained, had his counsel objected at trial, the trial outcome would have been the same because the state would have simply played the audiotape and presented Detective Wheaton's related testimony after the medical experts testified. Thus, even if

we assume that Cutright's counsel was deficient for failing to object to the audiotaped confession, Cutright cannot show prejudice.

## 2. The State's Mischaracterization of Cutright's Conduct

**{¶61}** Cutright contends that his attorney failed to object to the state's "serial mischaracterizations of Mr. Cutright's conduct" as a confession of "bending" and "twisting" J.C.'s limbs. He argues that he confessed only to "squeezing" J.C. – not "bending" or "twisting." Cutright contends that the prosecutor, from opening statements through closing arguments, referred to Cutright's confession as admitting to "bending" and "twisting."  As a result, the prosecutor was able to prove that Cutright knowingly caused serious physical harm, because a person is unlikely to "bend or twist the limbs of a weeks-old baby *un*knowingly" and bending and twisting "is almost certain to cause 'serious physical harm.' " (Emphasis sic.)

**{¶62}**  We find no merit to this argument. Detective Wheaton testified that Cutright showed him the way he squeezed J.C.'s arms and legs and the motion was like a revving of a motorcycle, which is a squeezing and twisting motion. Detective Wheaton explained:

> [Cutright] showed me, with his thumbs kind of in an upward position, that he was holding on to [J.C.'s] arms above the elbows up towards the shoulders with his thumbs in a slightly upward position. States he became extremely angry, squeezing and twisting as he rotates his hands and his thumbs down almost like you're revving up a motorcycle in a downward position while also pulling down.

From the record, we cannot determine whether "while also pulling down" is a "bending" motion that was included in this demonstration. Cutright admitted on the witness stand that he was moving his hands in some manner to show Detective Wheaton the motion he was making. Cutright denied on the witness stand that he used the term "bending." "I never mentioned bending * * * We were discussing them [the motions he was making with

his hands] but I didn't say anything about bending * * * I wouldn't do nothing about bending." But Cutright did not deny that he was showing Detective Wheaton a revving motion while also pulling down.

**{¶63}** The prosecutor does not have to parrot Cutright's trial testimony to describe the hand motions; the prosecutor can use the evidence provided by the state's own witness. The testimony from Detective Wheaton was that Cutright squeezed and twisted J.C., rotating his hands "like revving up a motorcycle * * * while also pulling down."  The prosecutor's use of the term "bending" for the phrase "while also pulling down" is well within prosecutorial discretion, and does not mischaracterize or misrepresent Detective Wheaton's testimony. "Generally, prosecutors are entitled to considerable latitude in opening statements and closing arguments." *State v. Clay*, 181 Ohio App.3d 563, 2009-Ohio-1235, 910 N.E.2d 14, ¶ 44 (8th Dist.) citing *Maggio v. Cleveland* (1949), 151 Ohio St. 136, 84 N.E.2d 912 (1949).

**{¶64}** An attorney's decision as to whether to object at certain times during trial is presumptively considered a trial tactic or strategy that we will not disturb. *State v. Fisk,* 9th Dist. Summit No. 21196, 2003-Ohio-3149, ¶ 9; *State v. Phillips*, 74 Ohio St.3d 72, 85, 656 N.E.2d 643, (1995). "Because 'objections tend to disrupt the flow of a trial, [and] are considered technical and bothersome by the factfinder * * * competent counsel may reasonably hesitate to object in the jury's presence.' " (Citation omitted.) *State v. Mickens,* 10th Dist. Franklin No. 08AP–626, 2009-Ohio-1973, ¶ 29, quoting *State v. Campbell,* 69 Ohio St.3d 38, 53, 630 N.E.2d 339 (1994); *State v. Blair*, 2016-Ohio-2872, 63 N.E.3d 798, ¶ 108 (4th Dist.); *see also Thacker* at ¶ 66.

**{¶65}** We find that trial counsel's failure to object to the prosecutor's description of the hand motions as "bending" and "twisting" was trial strategy and was not deficient.

**{¶66}** We overrule Cutright's seventh assignment of error.

## IV. CONCLUSION

**{¶67}** We overrule Cutright's assignments of error and affirm the trial court's judgment. The pending motion requesting a revised audiotape transcript is denied.

MOTION DENIED.

JUDGMENT AFFIRMED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED.  Appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the ROSS COUNTY COMMON PLEAS COURT to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court.  If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Abele, J.: Concur in Judgment and Opinion.


For the Court


BY: _____
            Michael D. Hess, Judge



## **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**